## HYDE v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. October 19, 1926.)

No. 2365.

**1. Banks and banking ⚖═257(3).**

Notes taken by borrower secured by chattel mortgage on the thing sold and discounted to bank, commonly called customers' paper, will not be considered in determining whether loans to borrower exceeded 10 per cent. of its capital, which national bank is authorized to loan to one business.

**2. Criminal law ⚖═815(5).**

Instruction, in prosecution under Comp. St. § 9772, for alleged false entry by national bank official, excluding consideration of testimony as to defendant's asking advice as to particular transaction from reputable bankers, *held* erroneous as excluding showing of good faith.

**3. Criminal law ⚖═308.**

Where in prosecution of bank officer under Comp. St. § 9772, for alleged false entries, different inferences might be drawn from given transaction, accused is entitled to most favorable inference.

**4. Banks and banking ⚖═256(1).**

Arrangement with customer to retire excessive loan by national bank with approval of national bank examiner, *held* not to involve concealment or intent to deceive as would support conviction of bank officer under Comp. St. § 9772.

**5. Banks and banking ⚖═257(3).**

Evidence *held* insufficient to convict officer of national bank of intent to deceive, under Comp. St. § 9772.

**6. Banks and banking ⚖═256(1).**

National bank officer *held* not required in report to Comptroller to include notes taken from borrower to strengthen customer's paper discounted by borrower.

Rose, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Ernest F. Cochran, Judge.

T. T. Hyde was convicted of violations of statutes governing banking, and he brings error. Reversed.

J. Waties Waring, of Charleston, S. C., and Mendel L. Smith, of Camden, S. C. (Waring & Brockinton, of Charleston, S. C., on the brief), for plaintiff in error.

J. D. E. Meyer, U. S. Atty., of Charleston, S. C., and Nugent Dodds, Sp. Asst. Atty. Gen. (Louis M. Shimel, Asst. U. S. Atty., of Charleston, S. C., on the brief), for the United States.

Before WADDILL and ROSE, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. The plaintiff in error, hereinafter referred to as the defendant, was indicted on September 15, 1924, in the United States District Court for the Eastern District of South Carolina, charged with various violations of the federal statutes governing banking; all of the counts being drawn under section 5209 of the Revised Statutes as amended (section 9772, Compiled Statutes). The indictment contained 174 counts. An examination of this indictment will show that the defendant was charged in a number of counts with making false entries with intent to deceive the Comptroller and his agents, and in a number of other counts with misapplication of the funds of the bank; some of these being charged with having been made through alleged loans to insolvent or irresponsible parties and others through alleged overdrafts.

Before the case was submitted to the jury, certain counts were withdrawn by the court, namely, Nos. 13, 18, 24, and 25 to 47, inclusive. The ninth count was also abandoned by the government. All of the other counts were submitted to the jury, and a verdict of guilty was found as to the defendant on the following counts: First, second, third, fourth, fifth, sixth, seventh, fifteenth, and sixteenth, and not guilty as to all the other counts.

An examination of the counts wherein a verdict of guilty was found will show that each one of these charged an alleged false entry with intent to deceive. The counts wherein the verdict of not guilty was found included all of those that charged misapplication and a number of those that charged false entries. A further examination of the counts wherein the verdict of guilty was found shows that the first, second, third, fourth, and fifth counts all relate to the same transaction, namely, a certain note of one W. H. Mixon. The sixth and seventh

15 F.(2d)—52

counts relate to one transaction, namely, a certain note of George M. Storfer. The fifteenth count relates to the entries in the report to the Comptroller relative to certain transactions of the Charleston Transfer Company, and the sixteenth count relates to the entries in the report to the Comptroller relative to certain transactions of the Charleston Republic Truck Company. It will thus be seen that, although there was a conviction on nine counts of the indictment, in reality the conviction was based on four different transactions, although certain of them were charged from different angles.

The Commercial National Bank was a banking institution in the city of Charleston, of which T. T. Hyde, the defendant, was the president. This institution had originally been organized as a state savings bank, and about 1910 obtained a charter as a national bank, and thereafter continued an uninterrupted existence until June, 1922, when it closed its doors. The history of this institution is similar to that of many others that were unfortunate enough to have been unable to sustain the enormous losses that resulted in banking and other business throughout this nation and particularly throughout certain Southern states as a result of the period of deflation and depression that came to this country some time after the close of the World War. It is a matter of such widespread knowledge as to hardly need comment that during and immediately following the war, there was a period of inflation and increase in values of property and business throughout this country that was unprecedented in its history. This was followed by deflation and in addition certain parts of the country underwent added losses of enormous amounts by reason of unforeseen and unfortunate crop conditions. A great number of farmers, merchants, and business men of large standing, property, and credit were ruined almost overnight, and as a result there followed a terrific series of business failures and crashes, which in turn rendered most property and securities of little value and caused many banking failures and other disasters.

The Commercial National Bank had been well managed and officered, and had steadily grown and enjoyed confidence, prosperity, and popularity. It, however, was unable to stand the stress of the depressed conditions above referred to. The reserve required of it with the Federal Reserve Bank consisted largely of Liberty Bonds, which had been purchased at par as a patriotic and supposedly safe investment. These bonds, hav-

ing fallen in value to between 80 and 90 cents on the dollar, and the Federal Reserve Bank ruling that the market value was the value at which they must be carried for the purpose of reserve, a shrinkage of between 10 and 20 per cent. of the value of the reserve immediately resulted. A large part of the loans and investments of this bank was based upon real estate in and around the city of Charleston. This city had had an era of prosperity during and immediately after the war. Extensive building operations had been in progress, and real estate values were advancing and seemed fixed on a solid and progressive basis. Suddenly, with the coming of the conditions above referred to, values were destroyed, and many properties became almost worthless from a standpoint of liquidation or ready sales. Large withdrawals by depositors, combined with frozen loans and the impossibility of realizing on collaterals, brought about a condition from which there was no escape, and the bank was forced to close its doors. The Commercial National Bank was one of five banks in this one city that failed as a result of these conditions.

The bank having closed in June, 1922, a committee of five of the directors of the bank took charge of it and endeavored to make arrangements looking towards a reopening of the bank. These negotiations continued for a considerable time, being entered into and acquiesced in by national bank examiners. Offers were received from other bankers and banking institutions offering to take over the assets of the bank, liquidate the same, pay all depositors in full, and pay to the stockholders any surplus that might remain. These were refused by the committee, apparently in the belief that their bank was in such good condition and its assets so strong that it could be reopened and become a valuable investment. Thus months went by, and in the meantime values were falling and continued to fall until finally it was found that there was no way out and the advantageous offers that had been made to this committee, and refused by it, were no longer available and finally the bank went into liquidation and has been turned over to a receiver.

As heretofore stated, the first five counts all relate to the matter of a note of W. H. Mixon. Briefly this transaction arose as follows: The Charleston Warehouse & Forwarding Company was a corporation organized for the purpose of erecting and maintaining a modern and up to date warehouse. Its entire capital stock was sold, and it was further financed by the issuance of bonds. These bonds were considered safe and high-class investments, and were bought by a number of persons and several banking institutions in the city of Charleston. The Commercial National Bank purchased 20 of these bonds, of a value of $500 each. This purchase was authorized by a resolution of the board of directors. To secure the issue of bonds the warehouse company had issued to a trustee a mortgage on its properties. Of course the purchase and ownership of these bonds was known to the members of the board of directors and to various national bank examiners, who from time to time examined the affairs of the institution.

Some time later, however, one of these examiners raised the question as to the legality or propriety of this investment, not on account of any question as to its monetary value, but on account of the fact that the bonds ran for a period of more than one year and the security for the same was real estate. The bank examiner took the position that this was in effect a loan on real estate extending for more than one year, and therefore improper for a national bank to have, and objected to the bank retaining the investment in that form. The president, certain members of the board, and the examiner consulted, and it was agreed that it would be acceptable to change the form of the loan by having some one give a collateral note with the bonds as security. In accordance with this plan, which seems to have had the approval of the bank examiner, Mr. W. H. Mixon executed a note for $10,000, with the bonds as collateral thereto, and the bank, through its cashier, released Mr. Mixon from the personal obligation of paying the note. It developed in the course of the trial that Mr. Hyde had consulted with another banker, who had adopted substantially the same course, as to how to meet the wishes of the bank examiner, and that Mr. Hyde had received advice from the other banker and an explanation of the method which had been adopted by the latter, which was satisfactory to the examiner. The defense attempted to offer testimony along this line, but it was excluded by the court, as is shown by certain assignments of error to be later more fully adverted to.

The foregoing transaction with Mr. Mixon is charged in five different ways, in the first five counts of the indictment, as violations of law. It is first charged that a false entry was made in entering the Mixon note on the note register of the bank. It is next charged that a false entry was made in the.

March, 1922, report to the Comptroller of the condition of the bank, in that the total amount of bonds owned by the bank as given did not include the $10,000 warehouse company bonds, which were in reality owned by the bank. It is next charged that a false entry was made in the May, 1922, report to the Comptroller of the condition of the bank, in that the total amount of bonds owned by the bank as given did not include these bonds, which were in reality owned by the bank. It is next charged that a false entry was made in the March, 1922, report to the Comptroller, in that it showed the aggregate liabilities of the bank and omitted the release to Mr. Mixon, which is alleged to be in effect an additional obligation. It is next charged that a false entry was made in the May, 1922, report to the Comptroller, in that it showed the aggregate liabilities of the bank, and omitted the release to Mr. Mixon, which is alleged to be in effect an additional obligation.

As heretofore stated, the sixth and seventh counts of the indictment relate to a transaction relative to a note given by one George M. Storfer, for $6,500. The facts in regard to this transaction are as follows: A loan of $6,500 was made on a note of George M. Storfer as authorized by the board of directors. Mr. Storfer was really extending his credit in the interest of the Charleston Transfer Company, in which his brother, a director of the bank, had an interest, and executed the note with the understanding that its payment would be guaranteed by a number of the directors of the bank, who were also interested in the Charleston Transfer Company. This was done, and the guaranty was executed, thereby making a much stronger paper than the note of Mr. Storfer. The guaranty having been obtained for the bank, Mr. Storfer received a letter holding him harmless from paying the note and stating that the bank would look to the guarantors, who were acceptable to it. This guaranty was in the records of the bank, and was available for inspection by the examiners or others interested in the bank. The transaction was, of course, known to the directors of the bank, and there was no concealment whatsoever.

In the sixth count of the indictment the defendant is charged with having made a false entry on the note register of the bank in entering there the above-named Storfer note, and it is claimed to have been a violation of the law because the bank had notified Mr. Storfer that it would not look to him, but rather to the guarantors for payment.

The seventh count charges that in March, 1922, report to the Comptroller of the condition of the bank the liabilities were set forth without including as a liability this letter to Mr. Storfer.

As also stated before, the fifteenth count of the indictment relates to a transaction with the Charleston Transfer Company. The Charleston Transfer Company was a corporation in the city of Charleston engaged in operating automobiles and trucks for the transportation of passengers and baggage. It had a large number of stockholders, among whom were a majority of the members of the board of directors of the Commercial National Bank, and the business and transactions of the company were well known to the bank directors. Several years previous to the closing of the bank the company was reorganized, certain capital stock issued, and additional money borrowed from the Commercial Bank in order to finance the purchase of a large number of valuable and high-priced limousines. Mr. W. H. Grimball (a member of the firm of Messrs. Whaley, Barnwell & Grimball) was one of the attorneys for the bank and also for the transfer company. Mr. H. E. Raines was a stockholder of the transfer company and occupied the position of manager. Six thousand dollars of the capital stock of the company was issued to Mr. W. H. Grimball, as trustee, and $5,000 of it to Mr. H. E. Raines, as trustee, and thereafter Mr. Grimball gave his note as trustee for $6,000 to the bank, and Mr. Raines a like note for $5,000. These amounts were borrowed on the credit of the makers, but the funds so obtained were loaned by them to the transfer company. These notes were collateral notes, and secured by the stock which had been issued to them. These notes were so carried by the bank for a number of years, and, of course, were known to the directors and seen by various examiners, who examined the affairs of the bank from time to time.

It was not until 1921 that an objection was ever made, and at that time Mr. La Rocque, a national bank examiner, stated that these loans were really for the benefit of the transfer company and should be included in the company's line of credit. This matter was fully discussed, and the officers of the bank took the position that they were not lending to the transfer company and final determination was not made until April, 1922, when Examiner Folger decided that they must be carried as the line of the transfer company, which was then done. At another time, Mr. Raines borrowed $5,000 upon

his note, which he in turn loaned to the transfer company. Mr. Raines was heavily interested in the transfer company, and this was a matter of lending his credit in order to obtain funds for his company.

Later additional funds were obtained for the company by borrowing $6,000 from the Albemarle Real Estate Company and $3,000 from the Colonial Realty Company. These two companies were real estate companies, and their credit was considered good and the security ample. They borrowed the money from the Commercial Bank and in turn loaned it to the transfer company. Before these transactions were carried through Mr. Hyde called a meeting of a committee, consisting of directors of the bank and directors of the transfer company, and asked their advice, and submitted that the funds could be obtained from real estate companies, if it met with the approval of the committee. This approval was given and the transaction carried through. The loans to these real estate companies were considered good at the time, and even after the bank closed they were listed as good by the committee in charge of the affairs of the bank and the bank examiner in charge of the bank after its closing. The note of George M. Storfer for $6,500 has already been explained with reference to counts six and seven.

In the fifteenth count of the indictment it is charged that a false entry was made in the report of March, 1922, to the Comptroller as to the condition of the bank, in that in such report it was required that the Comptroller be advised of any loans to any persons or corporations exceeding more than 10 per cent. of the capital and surplus of the bank. The credit extended to the Charleston Transfer Company was $28,200, which was a little less than such 10 per cent. In this count, however, it is charged that the loans to Messrs. Grimball, Raines, and Storfer and to the Albemarle and Colonial Companies were really loans to the Charleston Transfer Company and should have been included. As heretofore shown, these loans were made to the individuals or the companies, and they in turn loaned to the transfer company, so that the entries in the report were really true and correct.

[1] As heretofore shown, the sixteenth count of the indictment relates to a transaction with the Charleston Republic Truck Company. The Charleston Republic Truck Company was a corporation organized and engaged in the business of dealing in automobile trucks. From the time of its organization it was quite successful, and was do-

ing a very large business, and sold a great many trucks. Of course, in accordance with the general custom of automobile business, most of these machines were sold on time. In order to finance the company, money was borrowed from the Commercial Bank up to the amount of $28,500, which was the limit allowed it as being 10 per cent. of the capital and surplus of the bank. From time to time notes for the purchase of trucks, secured by chattel mortgages of such trucks, were discounted and sold by the company to the bank. Of course, this paper, commonly called in banking circles "customers' paper," would not be considered a part of the line of the truck company; the 10 per cent. limit referring only to the direct line of the company itself. However, when the period of deflation arrived, this business began to suffer heavy losses. It is well known that the automobile business probably was the heaviest loser, and suffered greater losses than any other class of business throughout this section of the country.

Many of those who had purchased trucks failed to keep up their payments and abandoned the machines, and when they were repossessed, there being no longer any market, the trucks were of very little value. Some of this customers' paper becoming past due, the bank made vigorous efforts to protect itself, and in order to do so it obtained notes from Messrs. Haltiwanger and Bradham. Mr. Haltiwanger was an officer, managing the affairs of the company, and Mr. Bradham was a salesman. Mr. Haltiwanger gave a note for $10,000, secured by a mortgage, which he held on certain real estate of the Republic Truck Company, and Mr. Bradham gave his note for $6,200, secured by trucks that had been repossessed. No additional money was obtained from the bank on these notes, but they were merely put in place of customers' paper, which had become uncollectible. These transactions were consummated in order to strengthen the paper that had become weak, and in fact considerable money was eventually realized upon the sale of the repossessed trucks and applied on these accounts.

The sixteenth count charges that these notes of Messrs. Haltiwanger and Bradham should have been added to the line of the Charleston Republic Truck Company, and that in the report to the Comptroller of March, 1922, as to the condition of the bank that they should have been shown as a part of the truck company's line. As a matter of fact no money was ever borrowed for the company on these notes, but they were put

in place of the customers' paper which had not been a direct line of the truck company. The entries stated the true state of facts as shown by the books of the bank and known to all parties concerned.

[2] It will be seen that, while there was a conviction upon nine counts, there were involved only four transactions, two involving the Mixon note and the Storfer note, and the other two involving the Charleston Transfer Company's indebtedness and the Charleston Republic Truck Company's indebtedness. With reference to the Mixon note and the Storfer note transactions, the court in its charge said to the jury as follows:

"Now, another thing that has been alluded to more than once, and I am going to allude to it for the last time, is certain testimony which is sought to be introduced here, and brought out, in reference to what some other banks did or may have done. I excluded that testimony, and I charge you now that that evidence on what other banks did or may have done, with reference to any particular form or means of disposing of bonds that they had on hand, that evidence is excluded, and you are not to consider it, for it has no relevancy in this case. If the law has been violated in this case by this defendant, as charged in this indictment, it is immaterial whether others did the same thing or not, and it has no place here at all."

We think there was error in this charge to the jury, in view of the fact that the conviction on the transaction based upon these two notes involved intent to deceive, bad faith, and lack of good faith. The defendant wanted to show that what he did with reference to the Mixon and Storfer notes was the same that had been practiced by some of the most reputable and substantial bankers in Charleston, and desired to show that he had advised with Mr. Rhett, an honorable and experienced banker, as to how to handle these two notes, and that he was advised to do as was done in the case. Indeed, it was claimed by the defendant that the examiner himself suggested this very method of handling the matter. Taking the Storfer and the Mixon note, with an agreement to relieve them from liability upon the notes, did not lessen or invalidate the assets of the bank, as these assets were still in the possession of the bank. The Mixon and Storfer notes were simply used for the purpose of complying with the examiner's suggestion that the bonds held by the bank were really mortgages on real estate and that

their due date was more than a year, and therefore that some method should be devised by which this objection could be eliminated, and taking the Storfer and Mixon notes in the manner described was simply for the purpose of meeting this objection or suggestion of the bank examiner.

The intent to deceive or defraud the government or its officials by what was done, or to misappropriate the funds of the bank, in which the bona fides, intent, purpose, or motives of misappropriation were essential features of the transaction, and the exclusion of testimony from which reasonable and fair inferences might have been drawn, throwing light on these questions, was of the utmost importance to the accused. The case of Crawford v. United States, 212 U. S. 183, 29 S. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392, gives special consideration to this subject, viz.: "There is a presumption of harm arising from the existence of an error, committed by a trial court against the party complaining, in excluding material evidence on a trial, especially before a jury. It is only in cases where the absence of harm is clearly shown from the record that the commission of such an error against a party seeking to review it is not cause for the reversal of the judgment." See, also, Deery v. Cray, 5 Wall. 795, 807, 18 L. Ed. 653; Smith v. Shoemaker, 17 Wall. 630, 21 L. Ed. 717.

[3] Under the circumstances we cannot but feel that there was prejudicial error on the part of the trial court in excluding from the consideration of the jury the fact that the defendant, in what he did, adopted the precise manner of dealing with the subject under consideration as that pursued by most bank officers of the larger banks, and that such course was known to, and not opposed by, the government's representative. Indeed, we are inclined to the view that the testimony tending to show the solvency of the bank, either before its suspension or afterwards, was a proper matter to lay before the jury, bearing upon the bona fides of what was done by the defendant. What was done in this case seems to have been open and above board by reputable people, the object being the safety from financial disaster and wreck of the institution intrusted to their care.

The crucial question in the case is whether or not there was an intent on the part of the actors to deceive and defraud the officials of the government or to misappropriate funds of the bank. The bona fides, the intent, purpose, and motive, of what was done, constituted the vital and important element

of the entire transaction, and therefore anything that took away from the consideration of the jury facts that might explain motives and purposes of the actors was a necessary and important matter in determining the character of the transaction, and its legality or illegality, and the guilt or innocence of the accused. It is difficult, indeed impossible, to know the motives and purposes of men, save by a fair and impartial review of their acts, and in reaching such conclusion the reasonable and fair inference to be drawn from what was done becomes of vital importance and moment. It would therefore have been proper for the court to have told the jury that where, from a given transaction, different inferences might be drawn, some favorable and some unfavorable to the accused, it was their duty to adopt the inference favorable to the accused under the circumstances.

The original notes of $6,000 of the Charleston Transfer Company and $5,000 referred to in the fifteenth count, executed by Grimball and Raines, trustees, respectively, and secured by stock in the Charleston Transfer Company, were made under date of February 20, 1919, and had frequently been inspected and approved by various examining committees of the board of directors and by bank examiners. No question was made as to the form or sufficiency of these notes until Examiner La Rocque's visit in December, 1921. The indebtedness of H. E. Raines, aggregating $5,000, was evidenced by two notes for $2,500 each, made respectively on February 7, 1921, and March 22, 1921. These loans were made upon Mr. Raines' personal credit. If Mr. Raines in turn loaned this money to the Charleston Transfer Company, this is accounted for by reason of his heavy interest in the company.

The indebtedness of the Albemarle Real Estate Company, referred to, aggregating $6,000, was evidenced by two notes in the respective amounts of $3,500 and $2,500, made respectively on June 4, 1921, and June 14, 1921. The indebtedness of Colonial Realty Company was evidenced by a note for $3,000, originally dated June 30, 1921. It will be seen that all of the notes referred to in this count had been among the assets of the bank for an extended period, prior to its closing on June 15, 1922, and it appears from the record that they had on a number of occasions been approved by committees and bank examiners. The officers of the real estate companies admitted the liability of their companies, and these loans were classi-fied by the directors, after the bank had closed, as "good, but slow."

[4] The testimony was that none of the above notes were ordered charged to the indebtedness of the Charleston Transfer Company until Bank Examiner Folger's visit in April, 1922, and that, upon final action being taken by the examiner, the defendant, together with the vice president of the bank, went to Washington and discussed this entire situation with the Chief Bank Examiner and the Comptroller. An arrangement was then made, with the approval of these officials, to have the company issue guaranteed preferred stock, in the amount of $17,000 from the proceeds of which the Grimball and Raines, trustees, notes were to be retired. There could not possibly have been any concealment, or intention to deceive, in this transaction; for the whole matter had been thoroughly discussed with the bank examiner, prior to March 10, 1922, and had been the subject of correspondence with the Comptroller. After a final decision had been made in the matter, at the Washington conference in April, 1922, the notes were shown as liabilities of the transfer company in the May, 1922, report to the Comptroller.

[5] The books of the bank faithfully and correctly represented the transactions referred to in this count, and we cannot see that there was sufficient testimony to convict the defendant of intention to deceive. The Charleston Republic Truck Company had borrowed up to the legal limit and in addition had discounted certain "customers' paper," which classification of paper is expressly exempted from the statutes limiting loans to any individual or corporation to 10 per cent. of the capital and surplus. The customers' paper was not surrendered at the time of the execution of the Brabham and Haltiwanger notes. The defendant, in an effort to strengthen the position of the bank, while retaining the "customers' paper," the discount of which was not questioned, secured additional collateral; the Haltiwanger note being secured by a mortgage on real estate, and the Brabham note by warehouse receipts on certain trucks, from which $5,000 was realized after the bank closed.

[6] The entries were regularly and properly made on the books of the bank. The Brabham and Haltiwanger notes were secured by the defendant to strengthen the "customers' paper," and no funds were advanced on these notes—they being simply substituted as direct obligations of the makers for the

"customers' paper," which was, however, held as collateral and not relinquished. Halti-wanger testified that the note was his individual obligation, and that he was legally bound for its payment, while Brabham was not put on the stand by the government. The "customers' paper" not being required to be included in the direct indebtedness of the company, in the report to the Comptroller, it was not incumbent on the defendant to include the notes taken under the circumstances detailed.

There were other assignments of error, but we deem it unnecessary to consider them, as a new trial must be awarded for the error pointed out above.

Reversed.

ROSE, Circuit Judge (dissenting). It matters not that the impressions which the record has made upon my mind as to the way in which the bank was managed before its doors were closed and as to its condition at the time of such closing differ from those which my brethren have formed. The guilt or innocence of the defendant of the things charged against him does not depend upon which view is correct as to those matters. No one questions that in 1920 and 1921 the banks of the country generally were under great strain, which was most severe in the agricultural states. It is largely because experience has shown that such conditions come now and then, as they did, for example, in 1857, 1873, and 1893, and that it is impossible for most men to foresee when they will manifest themselves, that national banks are forbidden to lock up their assets in loans upon real estate, or to loan more than 10 per cent. of their capital and surplus to any one business. The Comptroller of the Currency cannot know whether a bank is transgressing in such respects, unless the entries upon its books and the reports he receives from it tell the truth.

When, as in the instant case, the attention of the head of a bank is called to a violation of the law, and he, without altering the facts complained of, so manipulates his entries as to make it appear that the order of the Comptroller has been complied with, the common sense of the situation is that which has been done was with the intent to deceive the Comptroller, and, if the jury so finds, I think its verdict should stand. It is possible, though improbable, that a man might be president of a bank and honestly suppose that the law and regulations on these matters were concerned merely with the form given the transaction, and not with its sub-

stance, and if upon the whole evidence the jury entertain a reasonable doubt as to whether the accused official had any intention to deceive, they should acquit him, but that is a question upon which they are entitled to pass.

In the instant case the entries on the books and in the reports to the effect that certain persons owed the bank money, when they did not and never had done so, was not the making of a true entry of any transaction proper or improper, but was merely a false statement of what had taken place, and of what in consequence the state of the bank was.

Nor can I persuade myself that when the issues before the jury were, first, Was the entry false? and second, Was it intended to deceive? it made any difference whether the defendant before doing what he did consulted some other banker. In my judgment the record shows that the defendant had a fair trial, that there were no prejudicial errors in the rulings or instructions of the court, and that the judgment below should be affirmed.