**UNITED STATES of America, Appellee,**

v.

**Edwin DUNCAN, Jr., Appellant.**

**Nos. 77–2606, 77–2607.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 17, 1978.

Decided May 10, 1979.

---

Jack W. Floyd, Greensboro, N. C. (Richmond G. Bernhardt, Jr., Frank J. Sizemore, III, Keith C. Long, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant.

Patricia W. Lemley, Allen Holt Gwyn, Jr. and V. Edward Jennings, Jr., Asst. U. S. Attys., Greensboro, N. C. (H. M. Michaux, Jr., U. S. Atty., Durham, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge:

Convicted by one jury of electronic eavesdropping in violation of 18 U.S.C. § 2511(1)(b)(iv)(A) and of conspiracy to commit that offense in violation of 18 U.S.C. § 371 and by another jury of six counts of misapplication of bank funds in contravention of 18 U.S.C. § 656, Edwin Duncan, Jr. appealed both convictions, assigning numerous errors. The two cases were consolidated for briefing, argument and decision. Finding no prejudicial error, we affirm in both cases.

Part I of this opinion will sketch the factual and procedural background for the discussion that follows. Parts II and III consider the errors assigned in the eavesdropping and misapplication actions respectively. Part IV examines a series of contentions that relate to the validity of both sets of convictions.

### I. *Background*

Duncan's troubles, insofar as they are pertinent to these appeals, began in Sep-

tember 1971 when agents of the Internal Revenue Service came to the Northwestern Bank Building in North Wilkesboro, North Carolina to conduct an audit of defendant, the Bank and related taxpayers. At that time Duncan was president of The Northwestern Bank. The agents were assigned a small office on the third floor of the bank building. They were given keys to the office door and to the filing cabinet in it.

During the first month of the agents' visit, Duncan directed a bank employee, John T. Absher, to plant a radio transmitter in the office used by the agents. Absher rode to Winston-Salem, North Carolina, with Duncan to purchase batteries for the transmitter. Upon their return to the bank about 10:00 p. m., the two men entered the office assigned to the I.R.S., Absher climbed on a desk and, drilling a hole in the Celotex ceiling with his penknife, installed the microphone. Duncan then wiped the doorknob of the agents' office clean and the two left the bank.

Another bank employee, Jerry Duncan, was assigned the task of monitoring the conversations of the agents. Defendant instructed him on the use of the FM equipment required to intercept the conversations and the tape recorder used to preserve them. Although assured by defendant that the activity was legal, Jerry Duncan was instructed to keep it confidential. He and his office-mate, Athel Phillips, began to lock the door to their office to prevent anyone from happening upon the interception. In Jerry Duncan's absence, Phillips monitored the conversations. On one occasion when Jerry Duncan was out of town for a week, another employee, Robert Green, monitored the agents' work at defendant's instruction.

Periodically, defendant would come to Jerry Duncan and ask what was going on or Jerry Duncan would go to him and report. The cassettes upon which the conversations were recorded were delivered to defendant. Thirteen of the cassettes, however, malfunctioned and Jerry Duncan threw them in a drawer of his desk. Later he removed them to his car and then to his house where they remained until the summer of 1977 when he brought them to the United States Attorney's office.

The monitoring of the agents continued until January 1973 when the agents moved to the Federal Building in Wilkesboro, in part out of suspicion that they were being spied upon.

In March 1977, federal investigators again came to the Northwestern Bank, this time from the Federal Bureau of Investigation. One matter that came to their attention was the manner in which Duncan handled his checking account. The account was classified as "Code 3" for purposes of computer handling of the checks drawn on it. The computer was programmed to reject all items drawn on a "Code 3" or "no activity" account; each was then posted by hand. This "Code 3" classification was designed for special use to prevent forgeries when a customer's checkbook was lost or stolen; Duncan's account was the only one that was permanently so classified. As each of defendant's checks reached the Cash-Items clerk, she had them paid without debiting defendant's account. Periodically, Duncan would collect the checks being held, examine them, send some back through the computer "transcoded 27" so that they would not be rejected again and replace the others with a debit memo. Often, defendant went as long as six months between the times he reviewed the checks. One occasion that always triggered a clearance of the account was an audit visit from the state and federal bank examiners. On April 21, 1977, an agent of the F.B.I. found $11,800 worth of defendant's checks held in cash items. That day, Duncan's account was reclassified to a normal account.

Early in July, the F.B.I. discovered that the office they were occupying in the bank premises was equipped with electronic eavesdropping equipment. After first obtaining a search warrant, they searched the bank and found the equipment in place. Three days later, on July 15, arrest warrants for Duncan issued. The charges were electronic eavesdropping on both the I.R.S. and the F.B.I. and misapplication of bank funds.

After a magistrate initially found there was no probable cause to bind over Duncan on the charge of eavesdropping on the F.B.I., on August 12 the grand jury returned two indictments against Duncan. The first, in two counts, charged defendant with electronic eavesdropping on the I.R.S. and with conspiracy to commit that offense. The second, in six counts, charged misapplication of bank funds, each count corresponding approximately to a period during which defendant's checks were held in cash items at his direction without being debited to his account.

The grand jury investigation continued as the parties litigated a variety of preliminary motions. On September 6, the grand jury again indicted Duncan, this time on the charge of eavesdropping on the F.B.I.

On September 26, 1977, the trial of the I.R.S. charges began. Duncan relied principally on two defenses: that the agents could have exhibited no justifiable expectation of privacy in their conversations, and that he had withdrawn from the alleged conspiracy before August 12, 1972, the date prior to which prosecution was barred by the statute of limitations. The fact of the bugging was not disputed. Duncan's defenses did not persuade the jury and on October 3 they returned a verdict of guilty on both counts. Sentencing was postponed and the bank misapplication trial began.

Again defendant did not controvert the objective facts concerning the manner in which his account had operated, but he vigorously challenged the illegal characterization placed upon his conduct by the Government. The jury once more found Duncan guilty on all counts.

The F.B.I. trial was called for trial for November 7. Duncan pleaded guilty, pursuant to a plea bargain, on the charge of conspiracy to eavesdrop on the F.B.I.

On November 11, defendant was sentenced to a total fine of $22,000 and eight jail sentences, to run concurrently, the longest of which was three years. No sentence was imposed in the F.B.I. case. These appeals followed.

## II. *The I.R.S. Case*

In what will hereinafter be referred to as the I.R.S. case, defendant was convicted of the electronic interception of oral communications in violation of 18 U.S.C. § 2511(1)(b)(iv)(A) and of conspiracy to commit that offense in contravention of 18 U.S.C. § 371.

18 U.S.C. § 2511(1)(b)(iv)(A) was enacted as part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L.No.90–351, 82 Stat. 197. It provides:

Except as otherwise specifically provided in this chapter any person who—

. . . . .

. (b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

. . . . .

(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce . . .

. . . . .

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The offense includes four essential elements that the Government was required to allege and prove: that an interception was effected through the use of an electronic or mechanical device, that it was done willfully, that it was an interception of an "oral communication," and that the interception occurred on the premises of a business the operation of which affected interstate commerce. The term "oral communication" is defined in 18 U.S.C. § 2510(2) as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."

## A. *The Indictment*

Duncan begins his attack on these convictions by challenging the indictment. The indictment consisted of two counts, the first alleging the conspiracy and the second setting forth the substantive offense in a paraphrase of the statute.[1] Our concern at this point is with the latter.[2] It provided in essence that between September 1, 1971 and January 31, 1973, defendant willfully used a radio transmitter to "intercept oral communications between certain individuals then present in a third floor office in the Northwestern Bank Building" and that the operations of that bank affected interstate commerce.

■ Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides an indictment shall be a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). The basic requirement mandates that each essential element of the offense be alleged together with sufficient additional facts to allow the indictment to be used as proof in bar of a subsequent prosecution for the same offense. Moreover, the facts alleged should be sufficiently detailed to apprise the defendant of the charge against him so that the may prepare his defense. This latter function, however, may often be satisfied through the use of a bill of particulars or discovery.[3]

■ Defendant challenges the second count of the indictment for failure to allege an essential element of the offense, that a justifiable expectation of privacy be exhibited by the participants to the intercepted conversations. Use of the term "oral communications" and citation to the statute involved[4] sufficiently apprised defendant of this element. *United States v. Carroll*, 332 F.Supp. 1299 (D.D.C.1971). The Federal Rules of Criminal Procedure have abandoned the excessive technicality demanded of an indictment by the common law. While perhaps suited to an age when the typical punishment for many crimes was death and some amelioration of those rigors, albeit indirect, was necessary, technicality of this sort is no longer justified. *See* Medalie, *Federal Rules of Criminal Procedure*, 4 Law. Guild Rev., June-July 1944, at 1, 3. We note that defendant's principal defense at trial went to this element. Clearly, he was informed of the charges against him.

■■ Defendant also asserts that in the context of an indictment covering a seventeen month period use of the language "certain individuals" is too imprecise to inform him of the charges for which he was called to answer. The identity of the conversant whose communications are intercepted is not an element of the offense of electronic eavesdropping. Indeed, his identity is only pertinent insofar as it relates to the speak-

---

1. "On or about the first day of September, 1971 and continuing thereafter up to and including on or about January 31, 1973, in the County of Wilkes, in the Middle District of North Carolina, EDWIN DUNCAN, JR. wilfully did use and endeavor to use and did procure other persons to use and endeavor to use an electronic device, that is, a sub-miniature radio transmitter to intercept oral communications between certain individuals then present in a third floor office in the Northwestern Bank Building on B Street in North Wilkesboro, the operations of which Bank then affected interstate commerce; in violation of Title 18, United States Code, Section 2511(b)(iv) [*sic*]."

2. Defendant's only challenge to the conspiracy indictment is that it fails to allege a conspiracy to engage in illegal conduct. Since, as will be discussed below, we believe that defendant's

conduct as charged in the indictment was properly found to be criminal, we reject this contention.

3. Occasionally the suggestion is also made that the requirement that an indictment contain sufficient allegations functions to ensure that the grand jury find probable cause on each element of the offense. *E. g.*, 8 Moore's Federal Practice ¶ 7.04, at 7–15 (2d ed. 1968).

4. While the statute in the indictment is miscited, § 2511(b)(iv) instead of § 2511(1)(b)(iv), the statutory citation is not an essential part of the indictment, *see* note 11 *infra*, and an erroneous citation is not grounds for dismissal of an indictment or reversal of a conviction unless the defendant was thereby mislead to his prejudice. Fed.R.Crim.P. 7(c)(3). No such suggestion is made in this case.

er's expectation of privacy in his conversation and, as just explained, that element of the offense was sufficiently alleged. To the extent defendant is suggesting that the indictment did not apprise him that he was charged with electronically eavesdropping on agents of the Internal Revenue Service, we find the claim patently without merit. While defendant was denied a bill of particulars, the investigative file of the United States Attorney's office was opened for his inspection. The appraisal function of an indictment may be satisfied in this manner. *See United States v. Schembari*, 484 F.2d 931, 935 (4th Cir. 1973). Moreover, the substantive offense in issue here was charged in the second count of a two count indictment, the first of which alleged a conspiracy to commit the substantive offense and which explained in detail whose conversations were intercepted and exactly how it was done.[5]

### B. *Privacy Expectations of the IRS Agents: Proof and Instructions*

Defendant assigns a cluster of errors related to the trial court's handling of the issue whether the IRS agents "exhibited a justifiable expectation" that their conversations were not subject to interception. Some of these relate to the admission and exclusion of evidence, some to the instructions given the jury, some to the refusal to give requested instructions, and some to the sufficiency of the evidence to support a jury finding against the defendant on this issue. We treat these together because of their interrelatedness.

Viewed in the light most favorable to the Government, *United States v. Sherman*, 421 F.2d 198 (4th Cir. 1970) (per curiam), we conclude that the evidence was amply sufficient to support the jury's verdict against the defendant on this element of the offense. The mere fact that the agents came to the bank for the avowed purpose of conducting a confidential investigation would be a sufficient basis to find that they had and exhibited the expectation. Defendant's basic challenge is to the other aspect of the element, the justifiability of the expectation. Here too, there was ample evidence to support a jury finding. The agents were supplied with keys not only to the office, but to the filing cabinet within, an obvious assurance that their privacy was to be respected. Additionally, the agents testified that they gave no one permission to monitor their conversation and that they allowed no one to stand outside their frequently opened door on a regular basis. The eavesdrop tapes revealed language by the agents that a jury could readily infer they would not have used in public or around strangers, and conversations concerning matters related to the investigation that obviously were not for public consumption.

Duncan's main argument however was not with the sufficiency of the evidence favorable to the Government on the issue, but with the failure of the trial court to give him the benefit through jury instructions of various theories that he contends were relevant to show that the agents could not have had any justifiable expectation of privacy. The first of these theories was

5. Fully advertent to the rule that each count of an indictment must stand or fall alone, except insofar as the allegations of another count are incorporated by reference, we do not believe that that rule precludes consideration of the allegations of the conspiracy count in support of the sufficiency of the substantive count in this instance.

 As we noted earlier in text, the appraisal function of an indictment can be satisfied through discovery or use of a bill of particulars. It would be anomalous not to take into consideration a comparable source, the other counts of the indictment, just because it is part of the same piece of paper.

Considered for its res judicata/former jeopardy purpose the rule of express allegation or incorporation has obvious validity, but only with respect to the inclusion of essential elements of the offense charged. Since two offenses may differ only by the addition or subtraction of one essential element, each count should include either by express allegation or incorporation every such element. We are not in this case, however, confronted with the complete omission of an essential element of the offense, but at most a non-specific statement of an element clearly identified.

based upon evidence that the agents suspected that their conversations might possibly be monitored, though no direct indications of this possibility were manifested. On this evidence the trial court's position was that while actual knowledge might have this effect, mere suspicion of the possibility of interception would not. The jury was so instructed.[6] We believe that the trial judge properly applied the law defining the statutory offense to the evidence in this case. Certainly the law does not contemplate that the expectation required here shall be one held with perfect certitude that it is being respected at all times. At some point along the path of developing suspicion it must surely be possible for an originally justified expectation to become unjustified, but just as surely that point is not reached when a first glimmer of generalized suspicion that something *could* or *might* be amiss

is aroused. Such was the burden of the instructions given here, and on the actual evidence here adduced of possible suspicion subjectively felt by these agents, they accurately applied these principles.[7]

■ Electronic eavesdropping is by its nature difficult to detect. The capacity of modern electronics to invade the traditional sanctuaries for the maintenance of individuality and humanity was a principal concern of Congress when § 2511 was enacted. *See* note 12 *infra*. If by merely creating a generalized suspicion that a victim's communications were possibly being intercepted, while at the same time avoiding detection, an electronic eavesdropper could bootstrap his activity from the proscribed to the permitted, the congressional purpose would be frustrated.[8]

**6.** The jury was instructed that:

If a person knows for a fact that his conversations are being monitored . . . . . . . the person would not have a reasonable expectation that his communications were private and not subject to interception.

However, the mere fact that one might suspect that his private conversations could or might be surreptitiously intercepted does not remove his utterances from the definition [of oral communication]. The test is whether the utterances were made by a person exhibiting an expectation that his utterances were not subject to interception—that is, his utterances were privage [*sic*]—and that under the circumstances such expectation was justified.

While that instruction could perhaps be read in the abstract to withdraw the evidence of suspicion from the jury's consideration completely, the juxtaposition of the two ideas contained in the second paragraph indicates that the jury could still give that evidence of mere suspicion whatever weight they felt it deserved. While the instruction could have been clearer, we do not believe it constituted reversible error.

**7.** We do not read either *People v. Califano*, 5 Cal.App.3d 476, 85 Cal.Rptr. 292 (1970), or *People v. Santos*, 26 Cal.App.3d 397, 102 Cal. Rptr. 678 (1972), to hold that mere suspicion as a matter of law precludes the existence of a reasonable expectation of privacy. In both, the trial court found that those overheard in circumstances where they suspected they were being monitored did not have an expectation of privacy; the appellate courts were merely noting that those findings were not clearly erroneous. Moreover, the factual circumstances of those cases and the one at bar are markedly

different. In both *Santos* and *Califano* one or more of the persons whose conversations were intercepted were in police custody and the interceptions occurred in a jail visiting room and an interrogation room at the police station respectively. The possibility that one's conversations are being monitored is far more likely in that situation than when one is speaking in an office in a private business that has been provided for him.

**8.** Defendant complains that the district court limited his introduction of evidence relating to the agents' suspicions that they were being monitored. On one of the two occasions defendant complains of, his counsel was exploring with Agent Charles Anderson a provision in the *Internal Revenue Service Manual* that provided "Audit personnel will never use such devices for legal eavesdropping or surveillance except under direction of criminal investigators." While Duncan's counsel was obviously attempting to show that the agents were to some extent familiar with the subject of electronic eavesdropping, the line of questioning was bordering on the marginally relevant. It was clearly within the trial court's discretion to limit this line of inquiry in the interest of avoiding delay. Fed.R.Evid. 403. The second occasion of which defendant complains occurred moments later when in the absence of the jury the trial judge told counsel to move on to "the relevant issues in this case." What was said with respect to the first instance applies equally here. We note that defendant later was allowed to present additional evidence of the suspicions of the agents.

Defendant offers four other theories why the agents' expectation that they were not being monitored could not have been justifiable: because the owner of the premises, Duncan, as president of the bank, consented to the interception; because of the history of hostility between the bank and the I.R.S.; because the agents were "strangers" on the premises; and because the voices of the agents could be heard outside the office in which they worked. He complains that the district court's evidentiary rulings and instructions deprived him of the benefit of these theories to his prejudice.

■ Defendant's consent theory is predicated on dictum in a footnote to *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969): "Those who converse and are overheard when the owner is not present also have a valid objection [to surreptitious interception and recording of their conversations] *unless the owner of the premises has consented to the surveillance.*" *Id.* at 179 n.11, 89 S.Ct. at 970 n.11 (emphasis added).[9] However helpful to defendant a reading of this cryptic dictum may seem when lifted out of context, in context it simply has not the expansive implications for which he contends. *Alderman* was a standing case, posing centrally the issue whether the owner of premises has a constitutionally protectible privacy interest in the conversation of others surreptitiously intercepted on those premises. *Alderman* held that he does. The quoted dictum was an aside pointing out that so also did a visitor on the premises have a protectible privacy interest in his own conversations except as that might have been lost through application of the "third party consent" doctrine developed in traditional tangible object search cases. Under that doctrine a search or interception victim may be deemed to have assumed the risk that a third party may permit a search or interception by the police (or by others otherwise prohibited) of

premises or objects over which the target and the third party share control or access. Application of the doctrine thus depends on the existence of circumstances making it reasonable for the searcher or interceptor to assume that the target has no privacy expectation in respect of the particular premises or object. *See, e. g., United States v. Block,* 590 F.2d 535, 539–40 (4th Cir. 1978). In whatever way third party consent doctrine may transpose to the context of a premises owner's consent to electronic surveillance of the conversations of visitors on his premises by *others than himself,* it simply cannot be transposed to the situation where, as here, the consenter and the interceptor are one and the same. Any attempt to apply third party consent doctrine to the facts of this case simply returns us to the justifiable expectation of privacy analysis written into the eavesdropping statute. *Alderman* does not stand for the flat proposition apparently contended for by defendant that every visitor on the premises of another assumes the risk of electronic surveillance by the owner or others while there. *See United States v. Rizzo,* 583 F.2d 907 (7th Cir. 1978); *Simpson v. Simpson,* 490 F.2d 803, 808–09 (5th Cir. 1974). To interpret the eavesdropping statute in this way would put its application completely at the mercy of the owner or controller of premises covered by the statute. This cannot accord with congressional intent.

■ In one of his more novel contentions, defendant next asserts that the agents' expectation of privacy could not be justifiable because of the history of hostility between the I.R.S. and the bank. In support of this theory, defendant introduced testimony that a photocopy of a refund check won by the bank through litigation with the I.R.S. hung on the wall of the office of Edwin Duncan, Sr., father of the defendant and at the time of the alleged criminal activity chairman of the board of

9. While *Alderman* is a constitutional case, dealing with the admissibility of allegedly illegally intercepted conversations in a criminal trial, the privacy concerns protected by § 2511 are similar to those protected by the Fourth Amendment. S.Rep.No.1097, 90th Cong., 2d

Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2113 [hereinafter cited with pagination from *U.S.Code Cong. & Admin. News*] (Title III conforms to constitutional standards set out in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

Northwestern Financial Corporation, parent company of the bank. When defendant sought to introduce evidence that the agents' requests for bank documents met with resistance, thereby hoping further to establish an atmosphere of hostility, the trial court refused the proof and instructed that it would not matter whether the conversations intercepted had taken place in the camp of one's arch enemy. The trial judge also refused to instruct the jury on the hostility theory. Defendant asserts this was error, relying on a number of cases that have held that statements made by a prisoner in police custody may not be considered justifiably private. Whatever the precise scope of that doctrine, it simply will not transpose in logic to the situation presented here. The significant fact in the cases involving statements uttered while in police custody is not the hostility between officer and suspect; it is the fact that the speaker was in police custody. Those cases simply announce a societal decision that one may not reasonably expect his utterances to be private while he is being held in police custody for violation of the law. *See* note 7 *supra.* Here again, defendant contends for a principle that would permit the bootstrapping of proscribed activity into permitted activity by unilateral action of the person charged, here by the simple expedient of fomenting or creating the appearances of hostility. The district court properly concluded that this was an impermissible interpretation of the statute and so declined to give an instruction having that effect.

 ▪ Relying on the case of *United States v. Pui Kan Lam*, 483 F.2d 1202 (2d Cir. 1973), defendant next contends that the agents were "strangers" at the bank and therefore could not justifiably have expected privacy. Again, the principle invoked is inapposite to the facts of this case. In *Pui Kan Lam*, by arrangement with the police an apartment resident admitted to his apartment four persons—strangers to him—who were suspected of involvement in drug dealings with a former occupant. While in the apartment, these persons' conversations were overheard by the police using electronic means. Over objections that the interception violated their justifiable privacy expectations, the conversations were held admissible in evidence. While one who enters the apartment of a person he does not know may well have no justifiable reason to expect that anything he might say while in that apartment would be private, the I.R.S. agents in the case at bar were speaking in an office that had been provided for them and which they had regularly occupied as primary tenants for a year or more. The *Pui Kan Lam* case provides no support to defendant's "stranger on the premises" theory.

 ▪ Defendant's final theory that the agents could not justifiably expect privacy is that the walls of the office were so thin that ordinary conversation could be heard through them and that the agents frequently left the door to the tiny, unventilated office open and their voices could easily be heard in the hall. While the trial court allowed all the proffered evidence on their point to be admitted, it did refuse a requested instruction on the point. We conclude that the requested instruction, which is set forth in its entirety in the margin,[10]

10. In judging whether the expectation of privacy by the individuals in the third floor office was objectively justifiable, you must examine all of the surrounding circumstances and you must examine them for each individual conversation. You must decide initially whether or not agents of the Internal Revenue Service, conducting a tax audit of the Northwestern Bank in a room loaned to them by the Bank in the Bank building itself, could have justifiably expected privacy in that room. If you decide that such expectation of privacy may be justified, you must then look at the other surrounding circumstances, for example, such circumstances as whether or not the door to the room was left open, whether non-IRS agents were specifically excluded from the room during the conversations, the location (in a secluded area or on a main office thoroughfare with persons normally gathering or passing in the area outside the door), whether an attempt was made prior to the conversation at issue to examine the room or to exclude visitors, whether the Internal Revenue Service agents had any suspicions or knowledge that they might be being overheard, and any other similar factors. If you find that a person standing outside the room in the hallway or in an adjoining office or room could have overheard the conversations at issue with his unassisted ear, then you must find the defendant not guilty.

would have been much more favorable to the defendant than the law or the facts in evidence justified and that the trial judge did not therefore err in refusing to give it.

That conversations in a business office may be overheard through the open door of that office does not necessarily preclude those conversations from being "oral communications" protected from interception by the statute. *United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978). All the facts and circumstances must be evaluated to determine whether a justifiable expectation that a person's conversations are not subject to interception is exhibited. S.Rep.No. 1097, *supra* note 9, at 2178. A particularized rather than an abstract inquiry is required in specific adjudication of the issue. We conclude that the jury was adequately instructed and that there was sufficient evidence upon which they could find that the I.R.S. agents did have a justifiable expectation of privacy, notwithstanding there was evidence that on some occasions their conversations within the bugged office might have been overheard without aid of the electronic device.

Defendant's arguments on this issue come eventually to, or very near to, the proposition that the mere existence of the technology of electronic interception of speech coupled with general knowledge of its pervasiveness makes impossible any justifiable expectation of privacy against these devices in contemporary society. The very enactment by Congress of the statute in issue indicates that Congress did not accept this dismal assessment. So to interpret the statute would in practical effect eviscerate it by denying the more hopeful contrary premise on which it is based. We decline to do that.

### C. *The Interstate Commerce Nexus*

Defendant next contends that the evidence was insufficient to show the requisite nexus between the electronic eavesdropping charged to him and interstate commerce. Recently, in *United States v. Burroughs*, 564 F.2d 1111 (4th Cir. 1977), we noted that the "interception of . . . oral communications under § 2511(1)(b)(i)–(iv) specifically require[s] a showing of an effect upon interstate commerce to establish a violation of the statute." *Id.* at 1113 (emphasis omitted). From this, defendant argues that the Government was required to prove that the interception of the oral communications of the I.R.S. agents itself affected interstate commerce.

While this is the basic thrust of defendant's contentions, the details are more elaborate, as are the Government's counter contentions. As noted, defendant was charged with a violation of 18 U.S.C. § 2511(1)(b)(iv)(A) which prohibits the willful interception of oral communications on the premises of a business whose operations affect interstate commerce. Defendant initially contends that that provision was intended to reach only the electronic interception of trade secrets. This is initially argued as a matter of congressional intent, and the proposition is then reiterated as a matter of constitutional necessity. Conceding that the interception of trade secrets would constitute a sufficient effect on interstate commerce, defendant asserts that only by such a construction can subsection (iv)(A) be kept within the reach of Congress' power over commerce.

The Government advances several arguments against the contention that the statute was intended to be so limited, and argues that the statute, not so limited, may constitutionally be applied to the defendant's conduct on any of four grounds: the operations of the bank affected interstate commerce; the interception was of the oral communications of federal agents and Congress may act to protect the employees of the federal government; the interception was accomplished by the use of a radio transmitter and Congress may regulate even intrastate radio broadcasts; and the espionage took bank employees away from their regular duties thus directly burdening interstate commerce.

We address first the question of the statute's intended reach. While one of the congressional objectives in enacting Title III of the Omnibus Crime Control and Safe Streets Act and § 2511(1)(b)(iv) in particular was the prevention of industrial espionage by electronic surveillance, S.Rep.No. 1097, *supra* note 9, at 2181, we believe that had Congress intended to limit subsection (iv) to that objective it would have done so expressly. That this was clearly one objective of Congress does not mean that there were not others. The plain unambiguous language of the statute reaches far beyond the limited objective urged by Duncan and we cannot by interpretation ascribe to it this quite restricted meaning.

Turning to the constitutional contentions, we find congressional authority to enact § 2511(1)(b)(iv) sufficiently grounded in Congress' general power under the Commerce Clause rationally to classify for regulation certain activities found by it to affect interstate commerce and to devise appropriate means for the regulation.[11]

While Congress ordinarily leaves the question whether certain intrastate activities have the prohibited effect on interstate commerce to the courts or to the administrative agency charged with the enforcement of the particular statute involved, on occasion Congress itself determines that a particular activity has the requisite effect. *E. g., Perez v. United States*, 402 U.S. 146, 152, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 85 L.Ed. 609 (1941); see *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258–59, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). In such a situation the function of the federal courts is limited to determining whether the activities in question are in the class sought to be regulated, to determine if Congress acted rationally in deciding that it could regulate that class and to assess whether the method of regulation chosen was appropriate to the end sought to be achieved. *Id.* When the class of activities is properly regulated, the court does not have the authority to exclude from the regulation individual activities that may not in themselves have the requisite effect. *Perez v. United States*, 402 U.S. at 154, 91 S.Ct. 1357.

In enacting Title III, Congress sought to prohibit electronic eavesdropping to the full extent of its constitutional authority to do so. See S.Rep.No.1097, *supra* note 9, at 2180. In the process it made a determination that the fruits of electronic surveillance were being used by persons whose activities affected interstate com-

---

11. So holding, we need not decide whether the other constitutional bases advanced by the government would suffice. We note them briefly here.

(1) While Congress obviously has the power to legislate for the special protection of federal agents, *e. g.*, 18 U.S.C. § 1114; see *Barrett v. United States*, 82 F.2d 528 (7th Cir. 1936) (upholding constitutionality of predecessor statute), nothing indicates that it intended to do so in this instance.

(2) Subsection (ii) of § 2511(1)(b) prohibits the interception of oral communications through the use of a radio transmitter. Congress indisputably has the power to regulate all use of radio transmission equipment. See *Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 279, 53 S.Ct. 627, 77 L.Ed. 1166 (1933). While defendant was charged with a violation of subsection (iv), not subsection (ii), the citation of a statutory provision in an indictment is solely for the benefit of the defendants; its inclusion is intended to better apprise the defendant of the charges against him without danger to the prosecution. Fed.R. Crim.P. 7, Notes of the Advisory Committee. The rule has long been that a conviction may be sustained on the basis of a statute other than that cited in the indictment. *E. g., Williams v. United States*, 168 U.S. 382, 389, 18 S.Ct. 92, 42 L.Ed. 509 (1897). Miscitation of the statute is harmful error only if prejudice to the defendant can be shown. Fed.R.Crim.P. 7(c)(3). The indictment charged that the interception was by means of a radio transmitter and the undisputed evidence at trial was to the same effect. While this ground might suffice, we choose not to rely upon it. Aside from the charging problem, this theory was not submitted to the jury on the interstate commerce issue.

(3) We have not considered the contention that the use of bank employees for the eavesdropping purpose directly burdened interstate commerce by taking these people from their usual duties.

merce. Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90–351, Title III, § 801(a), 82 Stat. 197, 211. Congress had before it evidence that business plans were being stolen, that labor-management relations were being disrupted, that trade secrets were being betrayed.[12] The means chosen to deal with these problems was to prohibit all electronic espionage on the premises of businesses whose operations affected interstate commerce. We cannot say that this determination was irrational or that the means chosen were inappropriate. This left only the question whether in fact the activities of Northwestern Bank affected interstate commerce and this was found by the jury against the defendant under appropriate instructions, not here challenged, and upon ample evidence.

Defendant then resumes his attack on the statute's application to him by contending for a narrow definition of the word "premises" as it is used in § 2511(1)(b)(iv). He would construe it to refer only to those portions of the building actually being used by the business whose operations affect interstate commerce. He then argues that the third floor of the bank building where the I.R.S. office was located does not come within that definition. Contrary to defendant's contention, at least some of the evidence indicated that portions of the third floor were used for bank business. One of the agents testified that the office of the bank employee assigned to obtain any documents they requested was located across the hall from their office during the initial portion of their stay. The room in which the bank's board of directors met also seems to have been on that floor. While space commercially leased to an attorney or account-

ant for his use in a private business might be thought to have lost its character as part of the "premises" of the bank for purposes of § 2511(1)(b)(iv),[13] areas in which the bank has conveyed no enforceable property interest should not be so considered. Here the bank provided a portion of its building for the agents' temporary use. They occupied the space as mere guests; at most, in technical terms, as tenants at sufferance. For purposes of the definition in issue such space must be considered to be part of the bank premises during the period in issue. Any other construction would in practical effect deprive any temporary guest occupant of premises otherwise covered by the statute of its protection.

Still in the realm of the intended reach of the statute, Duncan complains that the district court instructed that Congress intended to prohibit *all* electronic eavesdropping. We note initially that defendant did not object to this instruction at the time of the charge. While defendant correctly notes that he requested several instructions that are inconsistent with the one given, and renewed his request after the charge was given, in these circumstances that was not sufficient. The function of the requirement that objection to jury instructions be made immediately following the charge is to allow the trial judge to rectify any errors he may have made. Rejected instructions relied on to fulfill this function must fairly serve the purpose. The instructions requested by defendant that he relies upon dealt with his "overhear" defense and are quoted in note 10 *supra.* As already noted, it was not error to refuse to give the instruction for the purpose requested. In the context requested, the rejected instruction

---

**12.** The Senate described its findings as follows:

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets

are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

S.Rep.No.1097, *supra* note 9, at 2154.

**13.** We of course do not reach that question today.

went more to the issue of the existence of a justifiable expectation of privacy than to the issue on which it is now urged as an effective objection to the instruction given. The requested instruction simply did not notify the judge of the asserted error here complained of.

In any event, the jury was properly instructed that they had to find the requisite elements of the charged offense before they could find Duncan guilty. Thus, while the trial court's instruction that Congress had intended to proscribe *all* eavesdropping may have been overly broad [14] the charge as a whole was sufficient.

### D. *Statute of Limitations Defense*

■ The indictment charged a conspiracy from on or about September 1, 1971 to January 31, 1973. The five year statute of limitations, applicable to violations of § 2511, allowed conviction only if the conspiracy still existed after August 12, 1972, that being five years prior to the date of indictment. Defendant argued at trial that the evidence showed he lost all interest in the eavesdropping and thus withdrew from the conspiracy before August 12, 1972. He now asserts that a portion of the jury instruction undermined this defense.

Among the overt acts listed in the conspiracy indictment was one charging that on or about February 1, 1973 Jerry Duncan told Ed Duncan that the eavesdropping equipment was still in his, Jerry's, office. In withdrawing this act from the jury's consideration, it having occurred if at all after the end of the time that the conspiracy was alleged to have existed, the trial court gave the following instruction.

> "As you were advised following the close of the Government's evidence, the indictment and evidence indicate that the alleged conspiracy terminated when agents of the Internal Revenue Service vacated the Northwestern Bank Building on or about January 15, 1973."

Despite defendant's contentions, we do not read this instruction to assert that Duncan himself did not withdraw from the conspiracy before August 12. In fact, the jury was expressly instructed that defendant contended he withdrew from the conspiracy prior to August 12 and that before they could find Duncan guilty of conspiracy they would have to find that he was a member of the conspiracy when one of the overt acts was performed between August 12 and January 15. Were we disposed to read the instruction in the manner for which defendant contends, however, we would decline to do so. Again, he failed to object when the charge was given and the error now asserted is not in the category of "plain error."

### E. *Discovery*

■ Duncan was not provided with the grand jury testimony of several of the I.R.S. agents in which they mentioned their suspicion that their conversations were being monitored until just prior to the agents' testimony at trial. The testimony was provided in compliance with the Jenck's Act, 18 U.S.C. § 3500, but defendant contends that it was also discoverable under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and thus should have been provided sooner. *Brady* requires production of any material that would be exculpatory. Under our view of the evidence of suspicion, as related above, this testimony would not have been exculpatory. At no point did the agents testify that they "knew" they were being monitored. In any event, the information was provided for defendant's use in ample time to get it before the jury. For both reasons, we consider any error in this matter to have been harmless.

■ Defendant complains that the "open file policy" followed by the office of the United States Attorney for the Middle District of North Carolina was ineffectual. The policy makes accessible to a defendant the entire file of the prosecution. It does not, however, allow copying of the docu-

---

14. There is support in the legislative history for the instruction. *E. g.*, S.Rep.No.1097, *supra* note 9, at 2113.

ments in that file. Rule 16 of the Federal Rules of Criminal Procedure does allow copying of documents and other materials that are discoverable under its provisions. To the extent that the open file policy functions as a substitute for compliance with Rule 16, rather than as a supplement to Rule 16 discovery, it is inadequate.

Defendant was not allowed to make copies of the tapes of the I.R.S. agents. If dated, the tapes would establish critical time periods of the bugging. Some tapes revealed background noise to the agents' conversation. Defendant contends he was effectively denied timely access to this evidence critically relevant to his "overhear," "suspicion," and statute of limitations defenses. While these tapes were subject to Fed.R.Crim.P. 16, we do not consider that the inadequacy of the open file policy to disclose them constituted reversible error. Defense counsel were allowed to listen to the tapes. Their authenticity is not questioned and, in any event, could have been established without regard to their contents. There was more than sufficient evidence, aside from the tapes, to show that on occasion sounds passed into and out of the bugged office. Similarly, there was other evidence showing that the bugging continued well into a period not barred by the statute of limitations. If all defendant wanted was the dates of the tapes, they were not dated. The dates during which the agents were at the bank were provided to defendant. While the agents dated the conversations for the use of the United States Attorney, that information was not discoverable. Fed.R.Crim.P. 16(a)(2). For these reasons, we consider that any error here was harmless.

### F. Other Errors

Defendant complains that the commission of an I.R.S. agent which would have shown that he was not employed by that agency until August 21, 1972 so that his conversations had to be monitored within the period covered by the statute of limitations was not produced until the Govern-

ment's case in chief in violation of Rule 16. Again, if error, this was harmless. Its marginal significance is indicated by the fact that the statute of limitations defense focused on defendant's withdrawal from the conspiracy prior to August 12, 1972, not on the termination of the interception prior to that date.

Duncan asserts that the work papers of the I.R.S. agents were discoverable under Fed.R.Crim.P. 16(a)(1)(C), but were not produced.[15] While we have doubts about the discoverability of these documents in light of I.R.C. § 6103, we need not decide that here. All defendant could have gleaned from these documents was evidence of hostility and perhaps of suspicion. In view of our conclusion that as offered by defendant, these theories of defense were not available under the circumstances of this case, any error here was harmless.

Finally, defendant complains of the admission of certain testimony of John Absher, an alleged co-conspirator and the person who the undisputed evidence shows actually planted the listening device in the ceiling of the I.R.S. office. Defendant claims it was prejudicial error to allow Absher to testify that "he had become totally mentally disabled as a result of his concern over the illegal act which he had committed at defendant's direction . . . ." Brief for Appellant at 43. In fact, Absher only testified that he suffered "mental anguish" from "worry" over having "violated the law." The details of his mental condition were in fact explored at length by defendant's counsel on cross-examination. Absher's testimony was not impermissibly prejudicial, see Fed.R.Evid. 403, when considered in the context in which it was given.

### III. Misapplication Case

In the bank misapplication case, defendant Duncan was convicted of six violations of 18 U.S.C. § 656. That statute provides in pertinent part:

Whoever, being an officer, director, agent or employee of, or connected in any

---

**15.** The Government properly had access to this file. I.R.C. § 6103(i)(1)(A).

capacity with any . . . insured bank . . . willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both . . . . .

As used in this section, the term . . . "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

That both defendant and the Northwestern Bank possess the requisite capacities for a violation of § 656 to occur is conceded. Little else is.

■■ For a violation of § 656 to be proved, the Government must show, in addition to the status of both bank and defendant, that the defendant acted willfully, that he misapplied funds, moneys, or credits belonging to or intrusted to the custody of the bank and that he did so with the intent to injure or defraud the bank. While the statutory language no longer makes reference to the last mentioned element, it remains a necessary part of the Government's proof. *United States v. Caldwell*, 544 F.2d 691, 696 (4th Cir. 1976).

■■ To show a misapplication, the Government must prove a conversion of bank funds to the use of the defendant or a third party. *Johnson v. United States*, 95 F.2d 813, 816 (4th Cir. 1938). Actual loss need not be proved, *e. g., United States v. Fortunato*, 402 F.2d 79, 81 (2d Cir. 1968); *Rakes v. United States*, 169 F.2d 739, 743 (4th Cir. 1948); rather, it is sufficient that the defendant at least temporarily deprive the bank of the possession, control or use of its funds. While subsequent restitution may be relevant on the issue of intent, it is not a defense since the crime is complete when the misapplication occurs. *Agnew v. United States*, 165 U.S. 36, 56–57, 17 S.Ct. 235, 41 L.Ed. 624 (1897); *Kramer v. United States*, 190 F.2d 712, 719 (4th Cir. 1951).

### A. The Indictments

■■ Defendant opens his attack upon these convictions with a challenge to the indictments. Arguing that the term "misapply" has no settled meaning, *United States v. Britton*, 107 U.S. 655, 669, 2 S.Ct. 512, 27 L.Ed. 520 (1882), and relying on this Court's decision in *Johnson v. United States*, 95 F.2d 813 (4th Cir. 1938), he contends that no criminal conduct is charged against him.

In *Britton*, the Supreme Court, construing one of the predecessor statutes of § 656, noted:

The words "wilfully misapplied" are, so far as we know, new in statutes creating offences, and they are not used in describing any offence at common law. They have no settled technical meaning like the word "embezzle" as used in the statutes, or the words "steal, take and carry away," as used at common law. They do not, therefore, of themselves fully and clearly set forth every element of the offense charged. It would not be sufficient simply to aver that the defendant "wilfully misapplied" the funds of the association.

107 U.S. at 669, 2 S.Ct. at 524. The Court went on to require that averments be made to show how the application was made and that it was unlawful. *Id.*

Our decision in *Johnson* is of the same mold. In that case the indictment simply charged the president of a bank with discounting a note made by one Stover and applying the proceeds of the note against an overdraft of the defendant's account at the bank. While it appears that in fact Stoner was insolvent so that the note was worthless, this was not alleged. Moreover, no allegation was made that the account was drawn upon after the proceeds from the note were deposited therein. In short, there was no allegation of conversion. Reiterating the principles announced in *Britton*, the Court concluded that no crime would be charged unless it was alleged that "some portion of the fund credited [as a result of the deposit of the proceeds from the note] is withdrawn from the possession

or control of the bank or a conversion thereof in some form is made so that the bank is deprived of the benefits thereof." 95 F.2d at 817.

Each of the six counts of the indictment against Duncan charged in the statutory language that defendant developed a scheme, with intent to injure and defraud the bank, to willfully misapply the funds of the bank. Each then went on to allege that defendant

> would write and cause to be written checks upon his aforesaid personal checking account, when he then well knew that said checks would not be debited to his personal account, but held in the Bookkeeping Department of the aforesaid Bank; and that by this scheme, [defendant] did wilfully misapply and cause to be misapplied, and did convert to his own use the possession, control and use of the monies, funds, and credits of the aforesaid Northwestern Bank . . ..

Much water has flowed under the bridge since we rendered our decision in *Johnson* and even more since the Supreme Court declared in *Britton* that "wilfully misapply" had no settled meaning. The cases are legion interpreting those words. While an occasional decision still reiterates the message in *Britton*, the modern trend seems to recognize that the term has developed a settled meaning; they no longer are "new in statutes creating offenses." *United States v. Mann*, 517 F.2d 259, 268 (5th Cir. 1975); *United States v. Archambault*, 441 F.2d 281, 283 (10th Cir. 1971); *United States v. Fortunato*, 402 F.2d at 81; *United States v. Kernodle*, 367 F.Supp. 844, 849 (M.D.N.C.1973) (Ward, J.), *aff'd per curiam sub nom. United States v. Pollard*, No. 74–1368 (4th Cir. Sept. 23, 1974); *see United States v. Moraites*, 456 F.2d 435, 441 n.9 (3d Cir. 1972). *But see United States v. Gens*, 493 F.2d 216, 221 (1st Cir. 1974); *United States v. Wiggenhorn*, 312 F.2d 289, 292 (9th Cir. 1963).

Both *Johnson* and *Britton* were decided prior to the adoption of Rule 7 of the Federal Rules of Criminal Procedure which put an end to the niceties of technical pleading. *United States v. Kernodle*, 367 F.Supp. at 849. Today, an indictment need only allege the essential elements of the offense and adequately apprise the defendant of the charges against him so that he may prepare his defense.

While time and intervening events have sapped *Britton* and *Johnson* of much of the basis for their rationale, we believe the Duncan indictments pass muster even under their standards. The manner in which the misapplication was achieved is alleged in sufficient detail. Defendant was apprised of the charges against him and that aspect of the demands of *Britton* is satisfied. Despite defendant's strenuous contentions to the contrary, a conversion is alleged, both by use of that specific word and by description of the manner in which it was achieved.[16] Unlike *Johnson*, this is not a case where only an innocent transaction is alleged. When defendant's checks were paid without a coincident debiting of his account, the bank was deprived of the control of its funds. *See Johnson v. United States*, 95 F.2d at 817. The bank's funds having been put at risk, that aspect of *Britton* which requires allegation of acts sufficient to show the misapplication to be unlawful is satisfied.

B. *Sufficiency of the Proof; Jury Instructions*

Defendant contends that the manner in which he operated his bank account could not have constituted a "misapplication" of bank funds in violation of § 656, so that the proof on this essential element was insufficient to support his conviction. He relies here essentially on two theories that the district court rejected in various rulings. The first, in general, points to defendant's financial ability at all times to cover all his undebited checks held in "cash items." The

16. Defendant's contentions that this was merely a bookkeeping transaction and that he always had sufficient funds so that there could be no conversion will be dealt with during our discussion of the sufficiency of the evidence, *infra*.

second would find "authorization" for the Code 3-cash items practice in nonaction by the bank's directors despite knowledge on their part of its existence.

■ Specifically, on the first theory, Duncan relies on evidence that at all times he had sufficient funds "in the bank" to cover his Code 3 checks held in cash items. He points first to the fact that only rarely was his checking account itself insufficient to cover them, i. e., in a state of technical overdraft.[17] Next he points to evidence that throughout the critical period he had access to other accounts in the bank and other sums immediately available for application to his checking account.[18] These latter sources in conjunction with his checking account, he contends, provided such absolute security to the bank that his practice, rightly understood, amounted to no more than a bookkeeping technique, and precluded as a matter of law any jury finding of "misapplication" within the statute's meaning. The district judge declined so to interpret the significance of this evidence in allowing the case to go to the jury and in declining to reject its verdict. We agree with this assessment.

As earlier noted, ultimate financial loss to the bank is not required for, nor will subsequent restitution exonerate from, a finding of statutory misapplication. The gist of this critical element of the offense is the withdrawal of funds, however temporarily, from the possession, control, or use of the bank. Id. Whatever the evidence might

have shown of Duncan's ability and intention to provide ultimate security against actual loss to the bank, it also showed unmistakably that the challenged practice gave him non-interest bearing, unsecured loans in whatever amount he chose to write checks. It also removed from the various procedures designed to permit responsible ongoing auditing of the bank's financial condition any sums that he chose to deflect from immediate debiting to his account. That his checking account was not continuously in a state of even technical over-draft and that he was amply solvent during this period does not avoid the fact that from the bank's standpoint the funds represented by the undebited cash items checks were at a variety of risks turning completely on Duncan's inclinations and whim so long as they were concealed from normal monitoring procedures. This constituted misapplication of funds within the meaning of the statute. See United States v. Caldwell, 544 F.2d at 696–97; cf. Benchwick v. United States, 297 F.2d 330 (9th Cir. 1961) (closely analogous practice; aiding and abetting).

■ Defendant also contends that no conversion could have occurred because the method in which he operated his account was "authorized." The position of the trial court was that evidence of authorization was relevant to the issue of defendant's intent to defraud, but not on the question whether a conversion occurred. The jury was so instructed and defendant's requested instruction to the contrary was refused.[19]

17. Duncan's actual contention is apparently that he was never in a state of overdraft. The evidence showed that during each of the periods covered by indictments except one, his account was in a state of technical overdraft (had it been debited) on some occasion. Had defendant's account been debited on February 14, 1975, within the period covered by count one, it would have shown an overdraft of $15,-752.58; on October 24, 1975, within the period covered by the second count, an overdraft of $26,413.96 would have appeared; on February 20, 1976, during count 3's period, the overdraft would have been $1,903.63; balancing on July 23, 1976, count 4, would have produced an overdraft of $10,434.29; and an overdraft of $791.05 would have appeared for count 5 had the account been debited on February 25, 1977.

18. There was evidence of other accounts than his personal checking account on which he could draw. There was other evidence that Duncan habitually kept on hand in the bank offices many checks payable to himself that were continuously available for deposit to his checking account.

19. The requested instruction was as follows:
You are further instructed that a conversion of funds refers only to those transactions which are not authorized by the party purportedly injured by the transaction. Thus, unless you are satisfied beyond a reasonable doubt that any transaction charged in the bill of indictment was not authorized by The Northwestern Bank acting under authority of its duly authorized agents and employees,

We believe this was a proper assessment of the relevance of this evidence.

Such a construction of the relevance of evidence of authorization is mandated by the purpose of § 656. As we recently stated, that purpose is to protect the assets of the Federal Deposit Insurance Corporation and of banks having a federal relationship. *United States v. Arthur*, 544 F.2d 730, 736 (4th Cir. 1976).

Defendant contends that since the Bank's board of directors knew how he operated his account, their acquiescence constituted sufficient authorization to preclude the occurrence of the conversion. Initially, we note that the evidence is far from consistent in respect of the directors' knowledge about defendant's checking account. It seems fairly certain that they had no idea how long defendant's checks were held in cash items and that the accumulated checks so held frequently exceeded in face value the balance in the account. In any event, even assuming the facts to be as defendant contends on this point, the directors' non-action here could not be held to preclude the existence of a conversion. While it is at least conceivable that under some circumstances a formally adopted resolution of a board of directors would carry with it sufficient procedural safeguards to protect the interest of the bank and of the Federal Deposit Insurance Corporation, a question we do not decide today, "authorization" by informal acquiescence certainly does not. If it did, a bank official would be able to use bank funds for his own benefit and continue to do so as long as the directors did nothing about it. Individual directors, concerned about full-time positions in other areas of commerce, might never direct full attention to the official's conduct. The official, if he had sufficient power, could stifle any attempt to bring the matter to the attention of the board.[20] In short, the purpose of § 656 would be sorely frustrated by the allowance of such a defense.

Defendant relies on *United States v. Klock*, 210 F.2d 217 (2d Cir. 1954) (Frank, J.), for the proposition that authorization precludes conversion. The opinion is ambiguous whether the authorization evidence, refused totally by the trial court, was relevant on the intent issue or on the conversion issue. To the extent the opinion can be read to make such evidence relevant on the issue of conversion, we decline to follow it, at least in circumstances such as are presented by this appeal. We note that *Klock* has been read to hold such evidence relevant only on the issue of intent. *See United States v. Riley*, 550 F.2d 233, 236–37 (5th Cir. 1977). The evidence was submitted here under proper instructions on the issue of defendant's intent to injure or defraud the bank, and was rejected by the jury.

■ Defendant objects to a jury instruction which he asserts instructed on theories not in evidence and gave a directed verdict on the issue of conversion by adopting the Government's theory. The instruction read as follows:

A misapplication is an unauthorized, unjustifiable, or wrongful use of bank's moneys, funds, credits, assets, or securities. A misapplication may be accomplished by various means, such as by the making of a loan which is insufficiently secured, or by the making of a loan to a fictitious borrower, or by the making of a loan where there is no intention to repay

you must return a verdict of not guilty as to any count charging such a transaction for the reason that an appropriation of funds which was authorized by The Northwestern Bank through its authorized agents could not be a misapplication of funds under the federal law.

**20.** There was evidence from which the jury could have concluded that such an occurrence was involved here. Jerry Steffey, a vice president in charge of Operations, prepared a report in the autumn of 1975 in which he proposed to mention defendant's checking account. When he informed George Collins, defendant's successor as president of the bank, of his intention, Collins told him to wait. Defendant then met with Collins, told him he had heard of Steffey's plans, asserted that he intended to continue the practice and that it should not be included in the report, and then suggested that Steffey had overstepped his bounds and perhaps should not be working for the bank. Defendant's account did not appear in the report.

or where the maker is insolvent, or by allowing the use of checks or debits to accounts backed by insufficient funds which act is consistently done or concealed, or by the writing of checks by one knowing at the time that such checks will be and are paid out of the bank's funds and not from one's personal account.

Clearly, the instruction does give examples of conduct which, if done with the requisite intent, could constitute a misapplication, but for which there is no evidentiary support in the record. While we recognize a danger of prejudice inherent in illustrative instructions of this type and take this occasion to caution extreme care in their use, we do not believe that in total context the instruction actually given here constituted reversible error. Fairly appraised, we think its obvious intention, to give mere hypothetical examples illustrative of the statutory meaning of a term frequently used nontechnically, must have been manifest to the jury. Other portions of the instructions carefully required the jury to find from the evidence the occurrence of each element of the offense beyond a reasonable doubt. Considered in context, we cannot conclude that the challenged instructions could have misled the jury to believe that it could find misapplication on the basis of any of these hypothetical examples not supported in the evidence.

Defendant next argues that there was insufficient evidence for the jury to conclude that he acted with intent to defraud the bank. We disagree, and summarize here the most salient evidence supporting the verdict on this element. North Carolina law prohibits a bank from making a loan to an officer or employee without a signed resolution adopted by a majority of the board of directors. While loans to an individual officer aggregating less than $2,500 need not be secured, beyond that amount "good collateral or other ample security or endorsement" is required. In no event can an officer be loaned more than $45,000. N.C.Gen.Stat. § 53–91. An employee overdraft policy, adopted in 1974 and which Duncan conceded on the stand applied to him, provided that any employee who had three overdrafts within a twelve-month period would be discharged.[21] Defendant never had an overdraft because only normal activity accounts, Code 1, were examined for purposes of the overdraft policy. His was the only Code 3 account and thus the only one to avoid that policy. The purpose of both the state law and the bank policy was to protect the bank from the financial maneuvering of its employees.

When the bank auditors came to examine Northwestern, the cash items clerk would call Duncan's secretary and his account would be cleared that day. When the auditors examined the cash items list, defendant's name therefore never appeared. In fact, the full extent of the manner in which defendant operated his account never appeared even on the cash items list. In the beginning of the period covered by the misapplication indictment, the cumulative balance of each customer's checks that were being held in cash items was entered on the cash items list. Later, when the clerk changed the procedure and began listing items separately so that the length of time each was so held could be determined, Duncan's checks were still aggregated and entered as a lump sum. Thus, even if a bank employee had looked at the cash items list out of concern over the manner Duncan did his checking, the length of time the bank had relinquished control over its funds, and

---

21. Evidence of the overdraft policy was clearly relevant on the issue of Duncan's intent. From the existence of the policy and its obvious purpose to protect the bank's assets, the jury could infer that defendant's conduct posed a threat to the bank and that by evading the overdraft policy Duncan intended to injure and defraud the bank.

Nor was the testimony of two former employees who were discharged for overdrafts an improper way to show that the policy was being enforced. With respect to Duncan's contention that the trial judge failed to balance the danger of prejudice against the probative value of the testimony of the former employees we cannot say that he so misjudged that balance as to have abused his discretion. *See* Fed.R. Evid. 403.

the full extent of the risk to which it was exposed, could not have been determined.

In short, the jury, with state law, the bank policy, and these practices in evidence before it, could have concluded that Duncan's checking account was deliberately designed to evade all routine inquiries into its operation. While a concerted examination of the account's operation would have revealed the full magnitude of the practice, the jury could further have concluded that Duncan would personally have thwarted such an examination. The Steffey incident, referred to previously, would have supported such a conclusion.[22] From the deliberate evasions of the safeguards created by both the bank itself and the state of North Carolina, the jury could conclude that Duncan acted with the intent to accomplish the very results sought to be avoided by those safeguards, so that he acted with intent to injure or defraud the bank.

Pointing again to the evidence that he always had sufficient funds in the bank to cover the checks held in cash items, Duncan argues that since this conclusively showed that the bank could not possibly have suffered a loss by reason of his checking account practice, it also conclusively negates the necessary element in the Government's case of intent on his part to injure or defraud the bank. He further argues that bank officials and employees as well as the Government officials charged with monitoring the activities of the bank knew how he conducted his checking account and that this lack of secrecy precluded a valid finding of intent to defraud or injure. These contentions go to inferences to be drawn by the finder of fact on evidence which in this, as in most, cases would support conflicting findings on the elusive issue of intent. The arguments were undoubtedly made with vigor and clarity to the jury by able counsel for defendant. There was evidence considered in the light most favorable to the Government to support the jury's finding against the defendant on this as well as the other issues submitted. *See United States v. Caldwell*, 544 F.2d at 696–97; *United States v. Scheper*, 520 F.2d 1355, 1358 (4th Cir. 1975).

*C. Conduct of the Trial*

Duncan objects to a refusal to admit proffered evidence of banking customs on the issue of intent in violation of the decision of *Hyde v. United States*, 15 F.2d 816, 821–22 (4th Cir. 1926).[23] The evidence to which he refers is a report of the Comptroller of the Currency on a then current investigation of banking practices, a transcript of a Presidential press conference on that investigation and a report to the Senate Committee on Banking, Housing and Urban affairs by the Chairman of the Federal Deposit Insurance Corporation which documented the overdraft policies of a selection of insured banks. Both reports were prepared and the press conference was held after the conduct which is the subject of this appeal occurred and defendant makes no suggestion that he knew of their contents during the time covered by the indictment. They would seem to be only marginally relevant to the question of Duncan's intent at the time he acted, and were properly excluded.

Duncan complains of several incidents during the trial relating to the district court's treatment of Duncan's experts. He asserts these led the jury to believe that a guilty man was attempting to avoid justice by subterfuge. The primary thrust of this contention involves the testimony of William Glenn, an accountant. Glenn had prepared a chart showing the daily average of the amount of defendant's checks held in cash items in one column; a daily average of the balance in defendant's checking account in another; the difference between those two figures; and the interest that

---

22. See note 20 *supra*.

23. On appeal Duncan suggests that this evidence was also relevant on the question of "criminality," a contention that apparently means that the manner in which he operated his account could not constitute a misapplication. Whatever this contention might add, it was not argued to the district court and thus is not properly presented for review.

would have been due either Northwestern at an eight percent rate or Duncan at a six percent rate on that difference.

When the defense offered the charts into evidence, the Government stipulated to their admissibility and the court responded with what Duncan characterizes as an "incredulous," "I beg your pardon?" Following additional testimony by Glenn, the Government finally objected and moved to strike a response that indicated the purpose of the charts was to show that the bank suffered no loss. A bench conference occurred, the court noted that loss to the bank was not an element of the offense and the jury was instructed that loss to the bank could only be considered on the issue of Duncan's intent. This instruction was repeated in the final charge. Twice during further testimony based on the assumptions that underlay Glenn's charts, the Government objected and the trial judge stated in the presence of the jury that he would have excluded the evidence when it was originally offered.[24] During the final jury instructions on the subject of experts, the court referred to "accountants and other experts." Finally, the court excluded Duncan's experts from the courtroom during the testimony of other witnesses but allowed F.B.I. agent Thomas Brereton to remain at the table used by the United States Attorney.

 The trial judge properly instructed the jury that to the extent Glenn's charts tended to show that the bank suffered no loss, this had relevance only to the issue of intent. As noted above, loss to the bank is not an element of the offense charged.

 While the trial judge could have been more temperate in his challenged comments, they cannot be held to constitute reversible error. The comments were basically explanation for his rulings on objections to testimony. The final jury charge contained an admonition to ignore any comments on the evidence made by the court and to decide the case on the basis of the evidence as the jury recalled it. The instructions on the relevance of the charts to the issues in the case were entirely proper and undoubtedly avoided any confusion the evidence might have caused the jury. The reference to "accountants and other experts" was fair comment in a case where much of the expert testimony was from accountants. Finally, we cannot say that the judge abused his discretion in allowing agent Brereton to remain in the courtroom, while excluding defendant's experts. Fed. R.Evid. 615; see Cooper v. United States, 594 F.2d 12 (4th Cir. 1979).

Duncan complains of the impeachment of his own testimony by evidence of his conviction in the I.R.S. case and of his conduct that was the basis for the charges in the F.B.I. case. Both instances of impeachment were proper.

 Evidence that a criminal defendant has been convicted of other crimes is not admissible unless the defendant takes the stand or otherwise puts his character in issue. E. g., Lane v. Warden, 320 F.2d 179, 181–82 (4th Cir. 1963). When, however, the defendant puts his character in issue or takes the stand, both of which Duncan did, evidence of prior convictions is admissible. At the time Duncan chose to testify in his own behalf, however, the trial judge had not yet accepted the jury verdict in the I.R.S. case. Alerted by the Government of its desire to use that verdict for impeachment, the trial court accepted the verdict, out of the presence of the jury, just before cross-examination of Duncan began. That act was a sufficient predicate for use of the "verdict" for impeachment. In any event,

---

24. Both incidents occurred during the Government's cross-examination of Charles Briley, another accountant offered as an expert by Duncan. The complete statements are as follows:

"Yes, ma'am. But the fact is that you didn't object to all the assumptions and so on before, and its already in evidence. You are objecting now, and I am going to sustain the objection. I would have sustained it then had you objected to it."

"Well, now you brought that out in cross-examination before and both sides have discussed it. As I said originally if you had objected, I would have kept it out. It's all over the record now, so I'm going to have to let it go."

while Fed.R.Evid. 609 is silent on the use of a jury verdict that has not yet been accepted for impeachment, the recent case law permits it. *United States v. Klein*, 560 F.2d 1236 (5th Cir. 1977); *United States v. Rose*, 526 F.2d 745 (8th Cir. 1975).

Since Duncan had stated on both direct and cross-examination that he believed there was nothing wrong with the way that he operated his checking account, the question whether he had electronically eavesdropped on agents of the F.B.I. at the bank was entirely proper, one of the subjects under inquiry by those agents being defendant's checking account. The jury was not apprised of the fact that charges were pending in relation to this conduct. Defendant's contention that the Government should not have been allowed to ask the question because it knew the response would be "no" is without merit. While Duncan had previously denied the pending charges, he had never done so under oath.

### D. *Pretrial Publicity*

The trial court denied Duncan's motion for either a continuance or a change of venue to avoid the effects of prejudicial publicity. We have previously expressed our confidence in the effectiveness of a skillful voir dire to counteract the threat of pretrial publicity, *see United States v. Jones*, 542 F.2d 186, 193 (4th Cir. 1976); *United States v. Abbott Laboratories*, 505 F.2d 565, 572 (4th Cir. 1974), and cannot say that the trial court committed manifest error in concluding that the publicity's danger was eradicated in this instance. *United States v. Morlang*, 531 F.2d 183, 187 (4th Cir. 1975).

■ A prospective juror need not be totally ignorant of publicity. Rather, the inquiry is whether a juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).

■ The trial court conducted the voir dire.[25] First, all members of the venire were asked if they had heard anything of defendant's troubles. Those who responded affirmatively were separated from the others and then questioned individually. All those who had heard of the I.R.S. conviction were excluded. Those who had heard about other aspects of Duncan's involvement with the law were questioned further about what they remembered, whether they could lay those memories or other memories awakened by testimony aside, etc. Some were excluded, others were not. Those who were not excluded were then reunited with those who had been exposed to none of the publicity and a jury was drawn from the group.

■ While defendant complains generally of the publicity throughout all of the proceedings, he asserts as reversible error only the failure to grant a continuance or change of venue in the misapplication case. Thus his contention must either relate only to the publicity of the I.R.S. conviction or be that the cumulative effect surpassed permissible bounds only with the *addition* of the publicity of the I.R.S. conviction.

If his claim relates only to the publicity of the I.R.S. convictions, exclusion of all members of the venire who had heard of those convictions was sufficient to protect defendant's right to an impartial jury. If the claim relates to the cumulative affect of all the publicity, the voir dire used by the trial court was sufficient to protect defendant's rights. The publicity simply was not bad enough to make voir dire totally ineffectual. *Cf. Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

To assert that the publicity was governmentally orchestrated does not alter our conclusion. The materials presented to us indicate that at least part of the publicity originated from defendant's camp. In any event, the question would still be whether fairness to the defendant may be accomplished. *United States v. Abbott Laborato-*

---

**25.** The trial court has broad discretion over the manner in which voir dire is conducted. *Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct.

848, 35 L.Ed.2d 46 (1973). The refusal to allow counsel to conduct that voir dire cannot be described as an abuse of that discretion.

*ries*, 505 F.2d at 571. We cannot conclude that manifest error was committed by the district court when it concluded that an impartial jury had been selected.

 Defendant then makes the argument that the exclusion of all persons who had heard of the I.R.S. conviction denied him a jury composed of a fair cross-section of the community, all those who were concerned enough to keep up with current events having been excluded. While it may be possible by rigorous logic to reconcile this contention with the apparently diametrically opposing one that the potential presence of such persons made a fair trial impossible, such an exercise is too subtle to impose on the workaday world of the litigation process. Considering the contention independently of its seeming opposite, we simply find it without merit in this case. A person's lack of knowledge of a specific occurrence simply could not serve as a general basis for drawing the conclusion of general disinterest necessary to defendant's theory, even assuming that the balance of the suggested syllogism would hold up in logic.

### G. *Juror Misconduct*

 After the verdict of guilty on all counts was returned by the jury, the foreman privately brought to the attention of the trial court two possible instances of impropriety by members of the jury. The foreman was particularly concerned that he thought he had heard another juror say that her brother-in-law had been involved in the Duncan investigation. While this proved to be erroneous, the foreman also mentioned that one member of the jury had been arguing Webster's definitions of "motive" and "intent." The foreman, however, had immediately told the group that they were to rely on the court's instructions, not on the dictionary definition. Duncan contends that he was entitled to a new trial because the use of the dictionary was prejudicial per se or, alternatively, that he was at

least entitled to a hearing where the jurors could be examined under oath about the use of the dictionary.

While reference to the dictionary was misconduct, it was not prejudicial per se. *See Rodriguez y Paz v. United States*, 473 F.2d 662 (5th Cir. 1973) (per curiam); *United States v. Siragusa*, 450 F.2d 592 (2d Cir. 1971); *Faith v. Neely*, 41 F.R.D. 361 (N.D. W.Va.1966); *Frazier v. Beard*, 201 F.Supp. 395 (W.D.Va.1962).

The circumstances in which juror misconduct can occur are probably as varied as all of human experience. We have followed the view that the district court may deal with such claims as it feels the particular circumstances require and have only reversed for abuse of discretion. *United States v. Peterson*, 524 F.2d 167, 177 (4th Cir. 1975); *see Wiltsey v. United States*, 222 F.2d 600, 601 (4th Cir. 1955) (per curiam). In this instance, we cannot say that the discretion has been abused.

 The foreman of the jury only mentioned the dictionary incident as an aside while reporting on the other possible instance of misconduct. He related that he had immediately squelched all discussion of the dictionary definitions. The judge thought little of the incident until he mentioned it to defendant's counsel and they indicated formal concern. By that time the juror involved had left on vacation. The judge ruled that in light of the limited inquiry permitted by Fed.R.Evid. 606(b), further inquiry would be futile. While a juror may testify that she had consulted a dictionary and related her findings to the group, neither she nor any of the other members of the panel can testify to the effect the extraneous influence had on the verdict or on their individual deliberations. Fed.R.Evid. 606(b).[26]

### F. *Discovery*

 Two weeks before trial a subpoena duces tecum was issued at the Govern-

---

26. Since we conclude that no formal hearing was required in this situation, we do not reach Duncan's contention that he was entitled to be

present at that "critical stage" of the proceedings.

ment's instance, to George Collins, defendant's successor as president of the bank, calling for the production of certain bank records relating to defendant's account. It provided that it was issued under Fed.R. Crim.P. 17(c) and stated that it could be satisfied by delivery of the documents to the F.B.I. Duncan attacks this as prejudicial error. On the record before us, it was harmless technical irregularity at most. Rule 17(c) allows the production of documents before the court at trial or at such other time and place as the court may direct. The rule is not intended to provide an additional means of discovery, but simply allows the inspection of subpoenaed materials before trial by all parties, thereby saving delay at trial. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220, 71 S.Ct. 675, 95 L.Ed. 879 (1951). The challenged defect suggests a misapprehension of the proper uses of the process. But where, as here, there is no contention that the merely permissive direction was actually followed, it is of course impossible to infer any prejudice.

### III. *Grand Jury Proceedings; Selective Prosecution*

In attacks addressed to both sets of convictions, Duncan raises three claims related to grand jury proceedings and one to the basis upon which the Government determined to prosecute him in these cases.

Two of his grand jury claims relate to the proceedings leading to his indictment in these cases; the third relates to grand jury proceedings in the F.B.I. eavesdropping case, asserting a spill-over effect prejudicing his trial in these two cases.

 It is claimed that on two occasions the grand jury proceedings in the instant cases were conducted in violation of the district court's order that all the proceedings be recorded. The record does show that there were two breaks in the continuity of recordation. Beyond that, it is simply impossible to infer prejudice from what might have occurred during the interludes, both of obviously short duration. The defendant would of course have us find

them sinister and suggests specific connotations. The Government of course has explanations showing them to have been utterly innocuous. Given the strong presumption of regularity accorded to the findings and deliberations of the grand jury, *United States v. Mitchell*, 372 F.Supp. 1239, 1248 (S.D.N.Y.1973), we cannot take the leap of inference required to accept the sinister explanations where the innocuous one is at least equally supported on the meager record. Next, attack is made on the use of grand jury subpoenas duces tecum which provided that they could be satisfied by delivery of the described documents to the agents of the F.B.I. This was acceptable grand jury procedure. Direct delivery of a mass of documents to twenty-three laymen would be "unproductive if not chaotic." *Robert Hawthorne, Inc. v. Director*, 406 F.Supp. 1098, 1118 (E.D.Pa. 1975). Chief Judge Parker, speaking of the role of the United States Attorney in the proceedings of the grand jury, dealt instructively and dispositively with this claim: "In investigations of [complex cases], it is necessary that the grand jury have the aid of counsel, not only in examining witnesses but also in digesting the great mass of evidentiary matter produced before them, which would mean little or nothing to them unless digested and analyzed in the light of applicable legal principles." *United States v. United States District Court*, 238 F.2d 713, 720–21 (4th Cir. 1956).

Defendant's final claim related to grand jury proceedings is more complicated and potentially serious. It stems from an awkward development by which, during the investigative stages of the various Duncan prosecutions, two lawyers from the firm that represented Duncan in these cases came into possession and maintained extended custody of two of the tapes that were eventually disclosed to have been used in electronic surveillance of the F.B.I. agents. Although the circumstances are involved and to some extent obscured in the record, the essential details are clear. On May 2, 1977, early in the investigation, before any indictments had been returned

against Duncan, the two lawyers went to the Northwestern Bank Building in North Wilkesboro to obtain some of Duncan's personal bank records for use in their representation of his interests. Included in the materials turned over to them by a bank employee were the two tape cassettes that were then presumably among Duncan's personal records and effects. The lawyers took the tapes, with other materials, back to their Greensboro office, and they remained there in custody of the firm until eventually turned over to the United States District Court on August 11, 1977. At the outset of their custody, the lawyers apparently did not know the nature of the tapes, nor of their use in the surveillance operation. During the course of one of their several unsuccessful efforts to listen to the tapes they inadvertently recorded over some portions. Sometime in early August, the lawyers apparently notified a United States Attorney that they had the tapes. This led shortly thereafter to a grand jury subpoena for the tapes, and this to a hearing before a United States District Judge, following which the tapes were turned over to the court under seal pending further orders. The link-up of these tapes to the surveillance of the F.B.I. agents was of course critical to the Government's investigation and to grand jury consideration of the F.B.I. bugging indictment. Only the lawyers could account directly for the details of their procurement in the first instance from Duncan's custody, their custody over a substantial ensuing period, and their condition during that period. For this reason the Government subpoenaed the two lawyers to testify before the grand jury. The lawyers appeared but declined, on the grounds of work-product and general attorney-client privilege, to answer most questions put to them. The privilege claims were then presented to a United States District Judge who, in camera, ordered that answers be given to all those questions propounded that he determined were not within the scope of the privileges invoked. The lawyers complied with the order, and testified to the basic facts concerning their custody of the tapes.

Duncan later pled guilty in the F.B.I. bugging case, and the lawyers did not testify in either the grand jury proceedings or at the trial of the I.R.S. bugging and misapplication cases. Duncan's claim on this appeal is that by its conduct relating to his lawyers' custody of the tapes, including their compelled testimony before the grand jury in a separate case, the Government has deprived him of fair trial rights entitling him to reversal.

The precise focus of this contention is not clear. To the extent it simply challenges grand jury consideration of testimony provided by his attorneys under compulsion of subpoena in another, though somewhat related, case, there is simply no merit to it. See *United States v. Kernodle*, 367 F.Supp. at 853.

The contention runs wider than this. Duncan claims that the ultimate effect of the Government's conduct vis-a-vis his attorneys was to compel discovery of evidence otherwise unavailable, and to deny him the effective assistance of counsel. The discovery claim is without merit. The grand jury has wide latitude in the evidence it may compel, and this evidence given in response to grand jury subpoena was directly relevant to the indictment under consideration.

The assistance of counsel claim requires more discussion. The gist of this claim is that the Government's continued assertion of its intention to call Duncan's lawyers as witnesses in all three cases, coupled with a concomitant continuing threat of their disqualification to represent him, denied him their effective assistance.

At the outset, we characterized these developments involving Duncan's lawyers as awkward. There is no doubt that this awkwardness created special problems for their representation here. We cannot say that it made their representation ineffective to a degree requiring reversal of these convictions. In fact, we think the record reveals an admirable handling of a situation, not of the Government's making, by the two district judges who dealt with it, resulting in

no rationally discernible prejudice to defendant on this score.

When the disqualification possibility arose, a conference of attorneys presided over by the chief judge and judge assigned these cases for trial was held to address it. At that time the Government was standing on the possibility that it might have to call Duncan's lawyers as witnesses in all the cases then pending. The possible relevance of their testimony in the I.R.S. and misapplication cases, though somewhat attenuated, could not be dismissed. For this reason, the district judge who was asked to rule in advance that the lawyers' testimony in those cases would be inadmissible declined to do so. Instead, the judges recommended to Duncan that unless a satisfactory stipulation could be worked out to obviate the need for the lawyers' testimony in the pending cases, he should employ stand-by counsel. No stipulation was ever worked out. As indicated, the F.B.I. case was not tried and, in the event, neither of the lawyers involved was called to testify in these other two cases. Duncan contends that nevertheless the continuing uncertainty about their status inevitably impinged unfairly upon his right to counsel. We can only say that the record that we have been required to scrutinize with great care on this appeal reveals unabated advocacy of the highest order of tenacity, imagination, skill, dedication and thoroughness on the part of defendant's counsel. We are bound to conclude that whatever the pressure created upon them, Duncan's lawyers were not inhibited by it to any degree discernible to the professional eye.

In the last of defendant's assertions of error, he claims that he was entitled to a hearing on the question of selective prosecution. The Government is given broad discretion in selecting whom it will prosecute. That discretion only runs afoul of the equal protection clause if it is based on the use of an unjustifiable standard such as race or religion, *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), or if it is exercised in response to the defendant's exercise of a protected right,

*United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) (en banc); *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972) (Craven, J.). Defendant's allegations of impermissible selectivity do not satisfy the criteria. Absent sufficient allegations properly raising the issue, defendant was not entitled to a hearing.

Following two lengthy trials conducted by a careful trial judge, two separate juries of defendant's peers have found him guilty of the offenses with which he was properly charged, and we find no reversible error in the two proceedings.

*AFFIRMED.*