966 F.2d 1445
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Ali M. OMAR, Defendant-Appellant.
 No. 91-5065.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 5, 1992
Decided: June 12, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Chief District Judge. (CR-83-38-A)
 Argued: Thomas J. Foltz, Alexandria, Virginia, for Appellant.
 Julie Anne Blink, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.
 On Brief: Richard Cullen, United States Attorney, Karen A. Kuhn, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before HALL and WILLIAMS, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Ali Omar appeals his convictions of conspiracy, embezzlement, wire fraud and mail fraud. Finding no merit in any of his assignments of error, we affirm.
 
 I.
 
 2
 Ali Omar is a Somali national. In late November, 1982, he helped his conspirator, Abdul Hussein, steal approximately $100,000 from depositors' accounts at the Naval Federal Credit Union in Vienna, Virginia. On two occasions, a telephone caller identifying himself as a credit union depositor requested the transfer of money to an account at a bank in New Jersey. The New Jersey account belonged to Omar. Hussein, an employee of the credit union, "processed" the transactions. Hussein prepared paperwork that falsely stated that the New Jersey account belonged to the depositor from whose account the funds were taken. On another occasion, Hussein caused a money order to be fraudulently issued and mailed to Omar.
 
 
 3
 On December 1, 1982, Omar wired $92,863.50 to the credit of Hussein at a bank in Zurich, Switzerland. He endorsed the money order to Hussein, and it was later deposited at another Swiss bank.
 
 
 4
 Scarcely a month later, Omar telephoned the U.S. Embassy in Switzerland to report the crime. An FBI attache in Switzerland, agent Ringgold, took the call. Omar identified himself and reported that Hussein had embezzled money from the credit union. Near the end of the fifteen-minute call, Omar admitted that the money had been transferred through his New Jersey account, and that Hussein had paid him 20,000 Swiss francs (worth around $10,000 at the time) to keep quiet. Ringgold had no prior knowledge of the crime. He relayed the information to an FBI office in New Jersey, which took over the investigation.
 
 
 5
 Omar and Hussein were indicted for conspiracy, embezzlement, mail fraud, and wire fraud. On the substantive offenses, Omar was charged as an aider and abettor. While out on pretrial bond, Omar fled overseas.
 
 
 6
 Omar was tried in absentia in May, 1983. His attorney presented no evidence, and Omar was found guilty of all charges. He remained a fugitive until April, 1991, when he was apprehended while attempting to enter the United States. He was sentenced to eighteen months of imprisonment.
 
 
 7
 Omar appeals.
 
 II.
 
 8
 None of the three individual account holders whose money was stolen testified at trial. Omar argues that the government did not prove that the transfers were made without the consent of the depositors, and the embezzlement conviction (and the other three counts derived from it) must fall. This argument is meritless.
 
 
 9
 First of all, the government did prove lack of consent by introducing Omar's confession to agent Ringgold. In the absence of any contradictory evidence, a reasonable jury could find lack of consent beyond a reasonable doubt.
 
 
 10
 Moreover, the government points out that the depositors have been reimbursed. The ultimate financial loss caused by embezzlement from accounts at a federally-insured institution falls on the insurer, and the government satisfies its burden by proving that funds entrusted to the care and custody of the credit union were misapplied. United States v. Duncan, 598 F.2d 839, 858 (4th Cir.), cert. denied, 444 U.S. 871 (1979). In addition to Omar's confession, the government presented the testimony of a credit union teller, who showed how the transfers of funds deviated from the credit union's procedures. There was ample evidence from which the jury could find that Hussein misapplied credit union funds with Omar's assistance.
 
 III.
 
 11
 The former head teller of Omar's bank in New Jersey, Yvonne Taylor, testified that she had prepared the paperwork in connection with the wire transfer from Omar's account to Switzerland. She stated that she knew Omar from his patronage at the bank and her patronage at a delicatessen where Omar was employed; however, she testified that she was unfamiliar with his handwriting.
 
 
 12
 Taylor identified the various documents connected with the wire transfer so that they could be placed into evidence. The government asked her what the signature was on each document, to which she replied, "Omar, Ali." She also identified Omar's signature card for his bank account, also signed "Omar, Ali."
 
 
 13
 Omar vigorously contends that the district court erroneously permitted Taylor to state an opinion on handwriting with which she was not familiar. See Fed. R. Evid. 901(b)(2). Omar has mischaracterized the evidence. Taylor did not offer an opinion as to the genuineness of the signatures. She identified an array of documents from which the jury could properly infer that the signatures were genuine. We see no error.
 
 IV.
 
 14
 Finally, Omar argues that Ringgold's testimony about the telephone confession should have been excluded. He invokes Miranda* and its progeny (which are patently inapplicable because Omar was not in custody), and quibbles with the quality of the government's proof that the statement was voluntary.
 
 
 15
 The only evidence on voluntariness came from Ringgold, and all of it supports the district court's decision to admit the confession. Omar initiated the phone call. Ringgold had no prior knowledge of the crime. Omar was not in custody, and could have broken off the conversation by simply hanging up. Ringgold had no ability to coerce Omar. These facts paint the paradigm of a voluntary confession.
 
 
 16
 The convictions are affirmed.
 
 AFFIRMED
 
 17
 FN*Miranda v. Arizona, 384 U.S. 436 (1966).